**No. 22-10166**


UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

——


UNITED STATES OF AMERICA**,**
Plaintiff-Appellee,

v.

SABINO RAMOS,
Defendant-Appellant.

——


Appeal from the United States District Court
for the Eastern District of California
Honorable Jennifer L. Thurston District Judge Presiding

——


# APPELLANT'S OPENING BRIEF

——


BENJAMIN P. LECHMAN
11400 W. Olympic Blvd.  Suite 200
Los Angeles, California 90064
Telephone: (619) 733-9789

Attorney for Defendant-Appellant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................................4

I. Statement of Jurisdiction ......................................................................5

II. Bail Status............................................................................................5

III. Issues Presented for Review................................................................5

IV. Statutory Provisions ...........................................................................6

V. Factual Background and Procedural History ........................................6

A. Mr. Ramos is arrested on July 8, 2021, with two firearms. ..................6

B. Mr. Ramos accepts responsibility early and pleads guilty to being a felon in possession of the two firearms with which he was arrested ..............................8

C. The government deftly avoids the Sixth Amendment and asks the district court to punish Mr. Ramos for an unrelated, earlier incident that the government could not prove and for which Mr. Ramos was never charged.....9

D. Mr. Ramos is sentenced, without even an evidentiary hearing, in violation of the Sixth Amendment for uncharged conduct that he disputed ............... 12

VI. Discussion ..........................................................................................13

A. The sentencing standard of proof should be clear and convincing evidence when it goes to uncharged criminal conduct that a defendant denies ........... 14

B. Punishing Mr. Ramos for an uncharged, unspecified, unproved crime violated his Due Process rights ......................................................................... 18

C. The alleged prior incident offense is not relevant conduct because it does not meet the three-part test for such conduct ................................................. 20

1. The alleged incident does not even meet the guideline definition of relevant conduct because it is not related to the instant offense.................... 20

2. The alleged relevant conduct does not group with the instant offense and there was insufficient proof that the incident even involved actual firearms. 20

3. The alleged incident was not "part of the same course of conduct or common scheme or plan.".................................................................................. 22

VII. CONCLUSION.................................................................................. 25

CERTIFICATE OF RELATED CASES..................................................... 26

CERTIFICATE OF COMPLIANCE.......................................................... 27

PROOF OF SERVICE ............................................................................... 28

# TABLE OF AUTHORITIES

## CASES

*McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986) ...................................... 18

*United States v. Brown*, 156 F.3d 813, 816 (8th Cir. 1998). ....................... 18

*United States v. Dominguez-Mestas*, 687 F.Supp. 1429, 1434 (S.D. Cal. 1988) ......................................................................................................... 19

*United States v. Galloway*, 976 F.2d 414, 425-26 (8th Cir. 1992) .............. 18

*United States v. Hahn*, 960 F.2d 903, 907 (9th Cir. 1992) ......................23-24

*United States v. Houston*, 217 F.3d 1204, 1209 (9th Cir. 2000) ................. 25

*United States v. Keifer*, 198 F.3d 798, 802 (10th Cir. 1999) ....................... 20

*United States v. Jordan*, 256 F.3d 922, 927, 929 (9th Cir. 2001) ............... 15

*United States v. Lillard*, 929 F.2d 500, 504 (9th Cir. 1991) ...................22-23

*United States v. Lonich*, 23 F.4th 881, 910 (9th Cir. 2022) ........................ 14

*United States v. Motz*, 936 F.2d 1021, 1026 (9th Cir. 1991) ....................... 22

*United States v. Parlor*, 2 F.4th 807, 816-17 (9th Cir. 2021) .................15-16

*United States v. Safirstein*, 827 F.2d 1380, 1385 (9th Cir. 1987) ............... 19

*United States v. Santiago*, 906 F.2d 867 (2d Cir. 1990) .............................. 24

*United States v. Taylor*, 97 F.3d 1360, 1363 (10th Cir. 1996) .................... 20

*United States v. Townley*, 929 F.2d 365, 369 (8th Cir. 1991). .................... 18

*United States v. Turner*, 898 F.2d 705, 708 (9th Cir. 1990) .................. 14, 23

*United States v. Valle*, 940 F.3d 473, 479 (9th Cir. 2019) .....................14-15

*United States v. Wade*, 388 U.S. 218, 228 (1967) ....................................... 17

*United States v. Watts*, 519 U.S. 148, 117 S. Ct. 633, 637 (1997) .............. 18

*United States v. Westerdahl*, 945 F.2d 1083, 1088 (9th Cir. 1991) ............. 22

*United States v. Wilson*, 900 F.2d 1350, 1354 (9th Cir. 1990) .................... 19

## STATUTES

18 U.S.C. § 922(g)(1). ...........................................................................*passim*

18 U.S.C. § 924(c)(1) .................................................................................... 22

18 U.S.C. § 2421(a) ....................................................................................... 1,5

26 U.S.C. § 5845 .......................................................................................21-22

28 U.S.C.§§ 41 ................................................................................................. 5

28 U.S.C.§§ 84 ................................................................................................. 5

28 U.S.C. § 1291 .............................................................................................. 5

28 U.S.C. § 1294(1) .......................................................................................... 5

28 U.S.C. § 3231 ............................................................... 5

**OTHER SOURCES**

Fed. R. App. P. 4(b)(l) ...................................................... 5

USSG § 1B1.3 ...................................................... *passim*

USSG § 2K2.1 ...................................................... 6, 12, 21

USSG § 3C1.2 ...................................................... 7

USSG § 3D1.2(d) ...................................................... 20

USSG § 6A1.3(a) ...................................................... 19

William W. Wilkins, Jr. & John R. Steer, Relevant Conduct: The
Cornerstone of the Federal Sentencing Guidelines, 41 S.C. L. Rev. 495, 515-
16 (1990)) ...................................................... 24

# I. STATEMENT OF JURISDICTION.

Mr. Ramos pleaded guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). [ER 8-31] The district court had original subject-matter jurisdiction over this offense against the laws of the United States. 28 U.S.C. § 3231. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. §§ 1291 & 1294(1) (appellate jurisdiction over appeal of final judgment from district court of circuit).

This Court has geographical jurisdiction over the Eastern District of California. See 28 U.S.C. §§ 41, 84, 1291, 1294(i). The district court entered its final judgment and commitment on July 1, 2022. [ER 1-7] Mr. Ramos filed a timely notice of appeal on July 1, 2022 [ER 100-102] See Fed. R. App. P. 4(b)(l) (notice timely if filed within 14 days of judgment).

# II. BAIL STATUS.

Mr. Ramos is currently in the custody of the Bureau of Prisons serving a 92-month custodial sentence. His projected release date is January 20, 2028. He will serve 36 months of supervised release thereafter. [ER 1-7]

# III. ISSUES PRESENTED FOR REVIEW.

(1) Should the sentencing enhancement standard of proof be clear and convincing evidence when it goes to uncharged criminal conduct, participation in which the defendant denies?

(2) Can a sentencing court increase a sentence for an alleged prior incident when that offense does not meet the three-part test for such conduct and the sentencing court makes no specific determination that it does?

## IV. STATUTORY PROVISIONS.

Pursuant to Ninth Circuit Rule 28-2.7, Mr. Ramos has included a copy of USSG §§ 2K2.1 and 1B1.3.

## V. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Mr. Ramos was sentenced in this case based on two separate offenses. The first was the one with which he was charged – being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) – a real, provable crime for which he was arrested and to which he pled guilty.

However, Mr. Ramos was also sentenced based on an earlier unrelated shooting at an illegal gambling house in which he was not involved whatsoever.

This appeal largely concerns Mr. Ramos being sentenced based on this other uncharged, unrelated, and unproved offense, that he did not commit, and increasing his sentence based on guns that were never proven to actually be firearms or even in his possession.

### A. Mr. Ramos is arrested on July 8, 2021, with two firearms.

On July 8, 2021, at approximately 6:05 p.m., BPD investigators were monitoring Mr. Ramos's location to arrest him for an outstanding warrant

6

related to a probation violation. An undercover Bakersfield Police investigator located Mr. Ramos in a vehicle in front of a home in Bakersfield, California. Unaware that he was being watched, Mr. Ramos drove away from the residence, followed by the undercover investigator, who requested assistance from marked patrol units to enforce a traffic stop. Additional officers responded and followed Mr. Ramos, activating their lights and sirens; however, Mr. Ramos drove approximately 90 miles per hour, and failed to yield. Ultimately he lost control of his car and fled on foot. Mr. Ramos removed a black satchel from around his neck and threw it in a parking lot. He eventually tripped and was arrested.

One of the officers retrieved the satchel that Mr. Ramos discarded while running and found a .357 revolver loaded with 5 rounds of .357 ammunition, and a Glock 19-style polymer 9mm handgun with no serial number. The satchel also contained a 25-round magazine loaded with 25 rounds of 9mm ammunition. Inside Mr. Ramos' car, officers located two cell phones, a laptop, and a box containing 14 rounds of 9mm ammunition.[1] PSR ¶¶ 6-11. A subsequent search of the phones in Mr. Ramos' car revealed pictures of what appeared to be handguns and text discussions about gun

---

[1] The circumstances of Mr. Ramos arrest garnered him an additional two-level upward adjustment in his sentence via USSG §3C1.2. He did not contest this adjustment below and does not here.

7

sales. PSR ¶¶ 12-16. Mr. Ramos was arrested and charged by way of

indictment with being a felon in possession of a firearm. [ER 9]

**B. Mr. Ramos accepts responsibility early and pleads guilty to being a felon in possession of the two firearms with which he was arrested.**

On February 4, 2022, Mr. Ramos pleaded guilty to a single count

Indictment, charging Felon in Possession of a Firearm, in violation of 18

U.S.C. § 922(g)(1). [ER 78-97] There was no plea agreement in this matter.

Mr. Ramos agreed to the following factual basis for his guilty plea:

> The Court: That on July 9, 2021, in Bakersfield, Kern County, state and Eastern District of California, that the defendant, Sabino Ramos, knowingly possessed a Ruger SP101 .357 resolver, serial number 572-97344. At the time he possessed the firearm, Ramos had been and knew he had been convicted of crimes punishable by a term of imprisonment exceeding one year, specifically a 1995 conviction for assault with a firearm for which he was sentenced to 22 years in prison, and a 2017 conviction for possession of narcotics for sale for which he was sentenced to four years in prison. The Ruger SP101, 357 resolver had been shipped and transported from one state to another.

[ER 74]

At his change of plea hearing, Mr. Ramos specifically limited his

admission to two firearms:

> THE COURT: I have the indictment here. Page 2, it says "any firearms and ammunition." It doesn't specify any particular firearm or ammunition that I'm seeing.
>
> MR. BAKER: Okay. Your Honor, that said, that would be my representation as to the government's intention with respect to the

universe of what's known to be used in furtherance of the crime, the two firearms and the magazine of ammunition.

THE COURT: Okay. So Ms. Gupta has mentioned a Ruger firearm, but you're saying there's a second firearm?

MR. BAKER: Correct, Your Honor.

MS. GUPTA: And Your Honor, Mr. Ramos doesn't claim a possessory interest in that firearm or the ammunition, so he can't agree to forfeiture as to those items.

[ER 81]

**C. The government deftly avoids the Sixth Amendment and asks the district court to punish Mr. Ramos for an unrelated, earlier incident that the government could not prove and for which Mr. Ramos was never charged.**

During the preparation of the PSR, the government and Probation Department advocated for several increases in Mr. Ramos' sentence based on an unrelated, uncharged, and ultimately unproven, May, 2022 incident. According to investigative reports, on May 5, 2021, BPD officers investigated a shooting at an illegal gambling enterprise. Video surveillance of the incident depicted a man holding two firearms, one of which appeared to possibly be inoperable. PSR at ¶ 26.

The PSR set forth the following: On May 5, 2021, Bakersfield Police received an emergency call related to a gunshot victim at 1014 Chester Avenue. Upon arrival, officers located Jesus Torres, who had two gunshot wounds to his upper torso. Torres advised officers he was working as a

security guard at 1012 Chester Avenue when several persons, dressed in black and wearing ski masks, entered the business and began shooting indiscriminately. PSR at ¶¶ 5-6.

Investigators determined that the businesses at 1012 and 1014 Chester Avenue had been operating as illegal gambling enterprises and Torres was not a security guard, but was a patron of the illegal gambling enterprise. An investigator viewed surveillance video from the businesses and determined Torres had arrived with another individual whose face was partially obscured by a personal protective facemask. PSR at ¶¶ 5-6. The surveillance video depicted a masked man holding two black firearms and then pointing the firearms towards a door leading to another room, but not firing them. *Id*.

It was the government's (unclear) theory that Mr. Ramos was present with Mr. Torres. The government had no proof of what the purpose of that presence was and did not specifically allege that Mr. Ramos had shot Torres.

Mr. Ramos vehemently and explicitly denied his presence at that incident. Mr. Ramos was never arrested or even charged with any offense based on the May incident. No physical or testimonial evidence linked him to it. Instead of evidence, the government relied upon guesswork; the government submitted an affidavit from Bakersfield Police Detective Nicholas Benavente, on whose search warrant affidavit the Probation Office

10

relied, guessing that the individual in the grainy video was perhaps

Mr. Ramos. [ER 32-47]

Benavente claimed he had "identified" Mr. Ramos by watching the

surveillance footage. He claimed to be familiar with Mr. Ramos because of

(1) a prior incident in which Mr. Ramos was a shooting victim (according to

other facts in the PSR, Mr. Ramos was shot in January 2021) (PSR at ¶ 63);

and (2) because Detective Benavente once observed him standing on a

balcony in July 2021. [ER 32-47]

Mr. Ramos disputed that he was the masked individual in the grainy

surveillance video and he also challenged the insufficient proof that the

items in the video were even actual firearms, as they were never seized or

examined in any way and were never physically connected to Mr. Ramos.

[ER 48-77]

The PSR used the contested unproven incident to increase the number

of firearms from the two to which Mr. Ramos has pleaded guilty to four,

based on the two items carried by the unidentified figure in the grainy

surveillance video. The PSR recommended adding these guns as follows:

> "In the instant offense, the defendant discarded a satchel that was
> found to contain two additional firearms. Given the Relevant Conduct
> principles under USSG §1B1.3(a)(2), specifically comment [n.
> 5(B)(ii)], it appears the May 5, 2021, incident should be considered
> Relevant Conduct under the guidelines, as it is part of the same course
> of conduct. The separate events share similarity, repetition, and are in

> temporal proximity to one another. Therefore, a two-level increase is recommended since the offense involved four firearms, pursuant to USSG §2K2.1(b)(1)(A)."

PSR at ¶ 26.

Mr. Ramos submitted detailed objections contesting this item and the government responded. Both filings are included in the Excerpts of Record, and include stills from the surveillance video. [ER 32-77] This Court can easily see that these pictures are insufficient proof of the identity of the person depicted or whether the items depicted are actual firearms.

### D. Mr. Ramos is sentenced, without even an evidentiary hearing, in violation of the Sixth Amendment for uncharged conduct that he disputed.

At the sentencing hearing, the district court overruled Mr. Ramos' objections and simply adopted the reasoning of the PSR without conducting any kind of evidentiary hearing. [ER 17-19]

> THE COURT: All right. Thank you. Considering this objection, for the reasons I've already discussed it appears to me that Officer Benavente was able to recognize Mr. Ramos from previous contacts. The video, the interior, I don't think I would consider it to be grainy overall, but clearly the interior photos do obscure the faces of the three individuals. However, the other information, clothing, is consistent with the person out in the parking lot, on camera 1, where the hoodie is not up, and the face mask is pulled down below the nose. The nose and the brow line are distinctive. And officer -- or Detective Benavente has asserted under penalty of perjury that this is the person who's recognized as Mr. Ramos.

[ER 17-18]

While the government produced surveillance footage showing a similarly dressed individual walking into what is alleged to be an illegal gambling operation earlier, and claimed that individual was Mr. Ramos, there was insufficient reliable information that individual was, in fact, Mr. Ramos when that individual's face was also partially obscured by a mask, and that individual otherwise lacks any distinctive features. The district court disagreed and found that whatever had happened on May 5, 2021, it was Mr. Ramos and whatever he may or may not have been doing, his sentence should be increased based upon the two items in the video that may or may not have been actual guns.

## VI. DISCUSSION

Shouldering Mr. Ramos with the burden of disproving his identity was a violation of Due Process. Mr. Ramos explicitly denied that he was the person depicted in the video from the uncharged incident. There was no proof that that the person in video is Mr. Ramos. Neither was there any conclusive proof that the items that individual was carrying were, in fact, firearms. Finally, there is nothing similar between the May 5, 2021, and the July 8, 2021, events to support the former's inclusion as relevant conduct here.

13

The government bears the burden of proving sentencing facts that are used to enhance a defendant's sentence under the Guidelines. *See United States v. Lonich*, 23 F.4th 881, 910 (9th Cir. 2022). Here, there was insufficient reliable information that the person depicted in the surveillance footage holding what are alleged to be two firearms is actually Mr. Ramos. The video is grainy. The individual's face cannot be seen, and it appears that the person's face is completely obscured by a mask. [ER 49-50] There were no other identifying features that would suggest that individual was Mr. Ramos. The district court should have employed a heightened standard of proof, consistent with the Sixth Amendment and this Court's concededly sometimes confusing precedent in this area. Shouldering Mr. Ramos with the burden of disproving his identity was a violation of Due Process. Additionally, the unproven May 2021 incident fails to even meet the guideline definition of relevant conduct.

### A. The sentencing standard of proof should be clear and convincing evidence when it goes to uncharged criminal conduct that a defendant denies.

This Court reviews the legality of a sentence *de novo*. *United States v. Turner*, 898 F.2d 705, 708 (9th Cir. 1990). As "a general rule," factual findings underlying a sentencing enhancement need only be found by a preponderance of the evidence. *United States v. Valle*, 940 F.3d 473, 479

14

(9th Cir. 2019). But this Court held that when "the challenged sentencing factors had an extremely disproportionate effect on the defendant's sentence relative to the offense of conviction . . . clear and convincing evidence is required for proof of the disputed enhancements." *United States v. Jordan*, 256 F.3d 922, 927, 929 (9th Cir. 2001); *United States v. Parlor*, 2 F.4th 807, 816-17 (9th Cir. 2021).

The government and the probation department argued below that the gambling house incident was relevant conduct and should be used to increase Mr. Ramos' sentence under USSG 1B1.3(a)(2). PSR at ¶ 26. Most guideline disputes involve two sides arguing that the same general set of facts may or may not support a particular sentencing adjustment. However, Mr. Ramos' claim is different because it arises from a constitutional argument: he is not the person who is accused of committing the alleged conduct.

In *Parlor*, *supra*, this Court noted that its precedent is "not a model of clarity" in this context. 807 F.4th at 817. This Court noted that the modern trend has been to focus on whether the increase is at least four levels or doubles the punishment. *Id*. The effect of four points is vastly different at different ends of the guideline table; it could result in an increase of a few months, or more than a decade in prison.

However, as noted in Parlor, there are at least four other factors employed by this Court in assessing the appropriate standard of proof: (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment; and (4) whether the increase in sentence is based on the extent of a conspiracy. *Parlor*, 2 F.4th at 817.

Here, permitting the government to merely guess that Mr. Ramos was the man in the video and that the man was in fact holding real operable firearms was an end-run around the Sixth Amendment and clearly "negates the presumption of innocence or the prosecution's burden of proof for the crime." How would Mr. Ramos rebut such an allegation exactly? Proving a negative is logically impossible.

Additionally, the incident involved a shooting which is vastly different than the charged offense, thereby, "creat[ing] new offenses requiring separate punishment." This was an obvious error by the district court.

16

As to the contention that there is sufficient reliable information because Bakersfield Police Detective Nicholas Benavente, on whose search warrant affidavit the Probation Office relied, concluded that the individual is Mr. Ramos. Detective Benavente states in his affidavit that he "identified" Mr. Ramos by watching the surveillance footage. He claimed to be familiar with him because of (1) a prior incident in which Mr. Ramos was a shooting victim, which according to other facts in the PSR, Mr. Ramos was shot in January 2021 (PSR at ¶ 63); and (2) because Detective Benavente observed him standing on a balcony in July 2021. No matter how well Benavente thought he knew Mr. Ramos from these two sightings, there is insufficient information to prove that is the same person ion the grainy video.

Additionally, eyewitness identifications are notoriously unreliable. *United States v. Wade*, 388 U.S. 218, 228 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification…A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification.").

There is no proof that that the person in video is Mr. Ramos. Neither is there any conclusive proof that the items that individual is carrying are, in

17

fact, firearms. Finally, there is nothing similar between the May 5, 2021, and the July 8, 2021, events to support the former's inclusion as relevant conduct here.

### B. Punishing Mr. Ramos for an uncharged, unspecified, unproved crime violated his Due Process rights.

Several courts have at least acknowledged "the possibility that the preponderance standard the Court approved for garden variety sentencing determinations may fail to comport with due process where, as here, a sentencing enhancement factor becomes 'a tail which wags the dog of the substantive offense.'" *United States v. Townley*, 929 F.2d 365, 369 (8th Cir. 1991*), quoting McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986). *See also United States v. Watts*, 519 U.S. 148, 117 S. Ct. 633, 637 (1997) (acknowledging divergence of opinion within the lower courts on this question); *United States v. Galloway*, 976 F.2d 414, 425-26 (8th Cir. 1992) (*en banc*) (acknowledging the possibility that due process may require a higher standard of proof than a mere preponderance "if the punishment meted out following application of the sentencing factors overwhelms or is extremely disproportionate to the punishment that would otherwise be imposed"); *United States v. Brown*, 156 F.3d 813, 816 (8th Cir. 1998).

The Sixth Amendment protects everyone from being punished for an offense without procedural safeguards. The district court here did an end-run

around the Sixth Amendment. As noted above, there was no real discussion about what Mr. Ramos was actually alleged to have done in May 2021. There was no proof that it was even him in the grainy video.

It was the government's burden to prove these allegations and rightly so. After all, it would be counterproductive and illogical to place the burden on the defendant of proving his lack of presence on the grainy video. It is logically impossible to prove a negative. *See, e.g. United States v. Dominguez-Mestas*, 687 F.Supp. 1429, 1434 (S.D. Cal. 1988) (noting same). The district court violated Mr. Ramos' Due Process rights.

A sentencing court violates a defendant's due process rights if it bases a sentence upon "information which is materially untrue or, if not shown to be false, to be so lacking in indicia of reliability as to be of little value." *United States v. Safirstein*, 827 F.2d 1380, 1385 (9th Cir. 1987). "[T]o ensure the reliability of information used at sentencing," the court must determine sentencing facts by a preponderance of the evidence. *United States v. Wilson*, 900 F.2d 1350, 1354 (9th Cir. 1990); *see also* USSG § 6A1.3(a) ("[T]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

### C.  The alleged prior incident offense is not relevant conduct because it does not meet the three-part test for such conduct.

In order for an offense to be included within the scope of

§ 1B1.3(a)(2), three prerequisites must be met. First, there must be a finding

that the offense in question involved conduct described in §§ 1B1.3(a)(1)(A)

and (B). Second, the offense must be the type of offense that, if the

defendant had been convicted of both offenses, would require grouping with

the offense of conviction for sentencing purposes under USSG § 3D1.2(d).

Third, the offense must have been "part of the same course of conduct or

common scheme or plan." USSG § 1B1.3(a)(2).

*United States v. Taylor*, 97 F.3d 1360, 1363 (10th Cir. 1996); *United States*

*v. Keifer*, 198 F.3d 798, 802 (10th Cir. 1999). These factors are not met here

and it was error to include the contested incident as relevant conduct.

### 1. The alleged incident does not even meet the guideline definition of relevant conduct because it is not related to the instant offense.

Guideline section 1B1.3(a)(1)(A) and (B) require relevant conduct be

related to the instant offense. Putting aside the lack of identity evidence here,

the alleged incident fails to even meet the first prong of 1B1.3, which

requires that relevant conduct only include conduct of the defendant, "[T]hat

occurred during the commission of the offense of conviction, in preparation

20

for that offense, or in the course of attempting to avoid detection or responsibility for that offense." USSG § 1B1.3(a)(1)(B). The alleged incident did not occur during the commission of the instant offense. The incident took place more than two months beforehand. It was similarly not "preparation" and did not involve "avoiding detection" for the instant offense. It simply failed to even meet the *prima facia* requirements of the plain language of the guideline.

### 2. The alleged relevant conduct does not group with the instant offense and there was insufficient proof that the incident even involved actual firearms.

Mr. Ramos was never arrested or charged with any activity regarding the gambling house. Additionally, it is not clear what the crime Mr. Ramos allegedly committed in May would be. Would it be a robbery? Where is the proof of that? Would it be firearms possession? Again, there is no proof that the items in the video are even actual firearms. The district court also needed to make a finding that any evidence concerning guns involved real guns. It never made that kind of finding because it did not have before it competent evidence to do so.

The guidelines here, via § 2K2.1, cross-references 26 U.S.C. § 5845, for the term "firearm" and mandates that it "shall *not* include an antique firearm or any device (other than a machinegun or destructive device)

21

which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon." 26 U.S.C. § 5845 (emphasis supplied) Similarly, the term "firearm" is defined for purposes of 18 U.S.C. § 924(c)(1), thusly: the firearm used must be "designed . . . or . . . readily convertible to expel a projectile by the action of an explosive." This Court has held that to be convicted under § 924(c), the defendant must have used a real gun, and not a toy replica. *United States v. Westerdahl*, 945 F.2d 1083, 1088 (9th Cir. 1991).

There was no evidence of any actual crime committed by Mr. Ramos. Even if the man in the grainy video had been holding up two forms of government-issued identification for Mr. Ramos, there is no proof that the items in question were actual firearms. The government utterly failed to carry its burden.

### 3. The alleged incident was not "part of the same course of conduct or common scheme or plan."

Whether conduct extraneous to an offense of conviction is part of the same "course of conduct" or "common scheme or plan" as the offense of conviction so as to be considered "relevant conduct" within the meaning of Guidelines § 1B1.3(a)(2), is reviewed for clear error. *United States v. Motz*, 936 F.2d 1021, 1026 (9th Cir. 1991); *United States v. Lillard*, 929 F.2d 500,

22

504 (9th Cir. 1991); *Turner*, 898 F.2d at 711;*United States v. Hahn*, 960 F.2d 903, 907 (9th Cir. 1992).

This Court requires a showing of similarity, regularity, and temporal proximity in sufficient proportions so that a sentence may fairly take into account conduct extraneous to the events immediately underlying the conviction. This test is especially important in cases where the extraneous conduct exists in "discrete, identifiable units" apart from the conduct for which the defendant is convicted. *Hahn*, 960 F.2d at 911.

Once a defendant objects to an allegation of relevant conduct, the burden shifts to the government to prove that conduct by means independent of the PSR. United *States v. Hahn*, 960 F.2d 903 (9th Cir. 1992). In *Hahn*, the government, like it did in Mr. Ramos' case, sought to increase his sentence based on similarly unproven guesswork. Hahn was convicted of, among other things, methamphetamine distribution. The district court adopted the PSR's relevant conduct drug calculation based on unproven allegations from a year prior to his count of conviction. 960 F.3d at 906-907.

In vacating his sentence, this Court observed that the alleged past sales were not proved to be part of the same course of conduct required by USSG § 1B1.3. *Hahn*, 960 F.2d at 910-911.

In assessing whether conduct is "relevant" within the meaning of Guidelines § 1B1.3(a)(2), "the sentencing court is to consider such factors as the nature of the defendant's acts, his role, and the number and frequency of repetitions of those acts, in determining whether they indicate a behavior pattern." *Id.* at 872.

There must be "'sufficient similarity and temporal proximity to reasonably suggest that repeated instances of criminal behavior constitute a pattern of criminal conduct.' " *Id.* (quoting William W. Wilkins, Jr. & John R. Steer, Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines, 41 S.C. L. Rev. 495, 515-16 (1990)). Thus, the essential components of the section 1B1.3(a)(2) analysis are similarity, regularity, and temporal proximity. *United States v. Hahn*, 960 F.2d 903, 910 (9th Cir. 1992); *see also, United States v. Santiago*, 906 F.2d 867 (2d Cir. 1990)(adopting same factors).

The alleged May incident is not sufficiently similar to the charged offense. As this Court noted in *Hahn,* supra, "when regularity is to provide most of the foundation for temporally remote, relevant conduct, specific repeated events outside the offense of conviction must be identified. Regularity is wanting in the case of a solitary, temporally remote event, and therefore such an event cannot constitute relevant conduct without a strong

24

showing of substantial similarity." 960 F.2d at 911. Here, every part of the relevant conduct analysis was missing and the district court erred in increasing Mr. Ramos' sentence.

## VII. CONCLUSION

The district court impermissibly increased Mr. Ramos' sentence based on guessing, guessing it was him in the video, guessing that the figure there possessed actual firearms. "Guessing is for contestants on television game shows, not for judges applying the law." *United States v. Houston*, 217 F.3d 1204, 1209 (9th Cir. 2000). For the reasons outlined above, Mr. Ramos respectfully requests that this Court vacate his sentence for the reasons outlined above, and remand for resentencing, or at a minimum, for an evidentiary hearing.

Respectfully submitted,

Dated: March 15, 2023        s/Benjamin P. Lechman
BENJAMIN P. LECHMAN
11400 W. Olympic Blvd, Suite 200
Los Angeles, CA 90064
Attorney for Defendant-Appellant

25

## CERTIFICATE OF RELATED CASES

Counsel for Mr. Ramos is aware of no other pending case raising

Issues similar to the issues here on appeal.

Dated: March 15, 2023

Respectfully submitted,
s/Benjamin P. Lechman
BENJAMIN P. LECHMAN
11400 W. Olympic Blvd, Suite 200
Los Angeles, CA 90064
Attorney for Defendant-Appellant

## CERTIFICATE OF COMPLIANCE

I certify that:

Pursuant to Fed. R. App. P. 32(a)(7)(c) and Ninth Circuit Rule 32-1, the attached opening brief is

 X   Proportionately spaced, has a typeface of 14 points or more and contains 4,785 words (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words), or is

___   Monospaced, has 10.5 or fewer characters per inch and contains ___words or ___lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

Dated: March 15, 2023              Benjamin P. Lechman
                                   BENJAMIN P. LECHMAN

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| UNITED STATES, | ) | U.S.C.A. No. 22-10166 |
|---|---|---|
| | ) | U.S.D.C. No. 21CR210-JLT |
| Plaintiff-Appellee, | ) | |
| | ) | CERTIFICATE OF SERVICE |
| v. | ) | |
| | ) | |
| SABINO RAMOS, | ) | |
| | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |

    I hereby certify that on March 15, 2023, I electronically filed the foregoing Appellant's opening brief and excerpt of record with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

    Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

    I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed an exact duplicate of the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

    Defendant-Appellant Mr. Ramos.

    I so state on March 15, 2023, in Los Angeles, California.

*s/Benjamin P. Lechman*
**BENJAMIN P. LECHMAN**

28

**Appendix A - U.S. v. Ramos, 22-10166**

# 18 USCS Appx § 1B1.3, Part 1 of 2

Current through Public Law 117-327, approved December 27, 2022, with a gap of Public Law 117-263.

*United States Code Service* > *TITLE 18. CRIMES AND CRIMINAL PROCEDURE (§§ 1 — 6005)* > *18 USCS appendix* > *SENTENCING GUIDELINES FOR THE UNITED STATES COURTS* > *CHAPTER ONE. Authority and General Application Principles* > *Part B. General Application Principles*

## § 1B1.3. Relevant Conduct (Factors that Determine the Guideline Range)

**(a)** Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

> **(1)**
>
> > **(A)** all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
> >
> > **(B)** in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
> >
> > > **(i)** within the scope of the jointly undertaken criminal activity,
> > >
> > > **(ii)** in furtherance of that criminal activity, and
> > >
> > > **(iii)** reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> **(2)** solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
>
> **(3)** all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> **(4)** any other information specified in the applicable guideline.

**(b)** Chapters Four (Criminal History and Criminal Livelihood) and Five (Determining the Sentence). Factors in Chapters Four and Five that establish the guideline range shall be determined on the basis of the conduct and information specified in the respective guidelines.

Commentary

*Application Notes:*

**1.** Sentencing Accountability and Criminal Liability. The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator.

**2.** Accountability Under More Than One Provision. In certain cases, a defendant may be accountable for particular conduct under more than one subsection of this guideline. If a defendant's accountability for particular conduct is established under one provision of this guideline, it is not necessary to review alternative provisions under which such accountability might be established.

**3.** Jointly Undertaken Criminal Activity (Subsection (a)(1)(B)).

**(A)** In General. A "jointly undertaken criminal activity" is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy.

In the case of a jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was:

**(i)** within the scope of the jointly undertaken criminal activity;

**(ii)** in furtherance of that criminal activity; and

**(iii)** reasonably foreseeable in connection with that criminal activity.

The conduct of others that meets all three criteria set forth in subdivisions (i) through (iii) (*i.e.,* "within the scope," "in furtherance," and "reasonably foreseeable") is relevant conduct under this provision. However, when the conduct of others does not meet any one of the criteria set forth in subdivisions (i) through (iii), the conduct is not relevant conduct under this provision.

**(B)** Scope. Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the "jointly undertaken criminal activity" is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). In doing so, the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others. Accordingly, the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B).

In cases involving contraband (including controlled substances), the scope of the jointly undertaken criminal activity (and thus the accountability of the defendant for the contraband that was the object of that jointly undertaken activity) may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities.

A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct (e.g., in the case of a defendant who joins an ongoing drug distribution conspiracy knowing that it had been selling two kilograms of cocaine per week, the cocaine sold prior to the defendant joining the conspiracy is not included as relevant conduct in determining the defendant's offense level). The Commission does not foreclose the possibility that there may be some unusual set of circumstances in which the exclusion of such conduct may not adequately reflect the defendant's culpability; in such a case, an upward departure may be warranted.

**(C)** In Furtherance. The court must determine if the conduct (acts and omissions) of others was in furtherance of the jointly undertaken criminal activity.

**(D)** Reasonably Foreseeable. The court must then determine if the conduct (acts and omissions) of others that was within the scope of, and in furtherance of, the jointly undertaken criminal activity was reasonably foreseeable in connection with that criminal activity.

Note that the criminal activity that the defendant agreed to jointly undertake, and the reasonably foreseeable conduct of others in furtherance of that criminal activity, are not necessarily identical. For example, two defendants agree to commit a robbery and, during the course of that robbery, the first defendant assaults and injures a victim. The second defendant is accountable for the assault and injury to the victim (even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone) because the assaultive conduct was within the scope of the jointly undertaken criminal activity (the robbery), was in furtherance of that criminal activity (the robbery), and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).

With respect to offenses involving contraband (including controlled substances), the defendant is accountable under subsection (a)(1)(A) for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity under subsection (a)(1)(B), all quantities of contraband that were involved in transactions carried out by other participants, if those transactions were within the scope of, and in furtherance of, the jointly undertaken criminal activity and were reasonably foreseeable in connection with that criminal activity.

The requirement of reasonable foreseeability applies only in respect to the conduct (i.e., acts and omissions) of others under subsection (a)(1)(B). It does not apply to conduct that the defendant personally undertakes, aids, abets, counsels, commands, induces, procures, or willfully causes; such conduct is addressed under subsection (a)(1)(A).

**4.** Illustrations of Conduct for Which the Defendant is Accountable under Subsections (a)(1)(A) and (B).

**(A)** Acts and omissions aided or abetted by the defendant.

**(i)** Defendant A is one of ten persons hired by Defendant B to off-load a ship containing marihuana. The off-loading of the ship is interrupted by law enforcement officers and one ton of marihuana is seized (the amount on the ship as well as the amount off-loaded). Defendant A and the other off-loaders are arrested and convicted of importation of marihuana. Regardless of the number of bales he personally unloaded, Defendant A is accountable for the entire one-ton quantity of marihuana. Defendant A aided and abetted

the off-loading of the entire shipment of marihuana by directly participating in the off-loading of that shipment (i.e., the specific objective of the criminal activity he joined was the off-loading of the entire shipment). Therefore, he is accountable for the entire shipment under subsection (a)(1)(A) without regard to the issue of reasonable foreseeability. This is conceptually similar to the case of a defendant who transports a suitcase knowing that it contains a controlled substance and, therefore, is accountable for the controlled substance in the suitcase regardless of his knowledge or lack of knowledge of the actual type or amount of that controlled substance.

In certain cases, a defendant may be accountable for particular conduct under more than one subsection of this guideline. As noted in the preceding paragraph, Defendant A is accountable for the entire one-ton shipment of marihuana under subsection (a)(1)(A). Defendant A also is accountable for the entire one-ton shipment of marihuana on the basis of subsection (a)(1)(B)(applying to a jointly undertaken criminal activity). Defendant A engaged in a jointly undertaken criminal activity and all three criteria of subsection (a)(1)(B) are met. First, the conduct was within the scope of the criminal activity (the importation of the shipment of marihuana). Second, the off-loading of the shipment of marihuana was in furtherance of the criminal activity, as described above. And third, a finding that the one-ton quantity of marihuana was reasonably foreseeable is warranted from the nature of the undertaking itself (the importation of marihuana by ship typically involves very large quantities of marihuana). The specific circumstances of the case (the defendant was one of ten persons off-loading the marihuana in bales) also support this finding. In an actual case, of course, if a defendant's accountability for particular conduct is established under one provision of this guideline, it is not necessary to review alternative provisions under which such accountability might be established. See Application Note 2.

**(B)** Acts and omissions aided or abetted by the defendant; acts and omissions in a jointly undertaken criminal activity.

**(i)** Defendant C is the getaway driver in an armed bank robbery in which $15,000 is taken and a teller is assaulted and injured. Defendant C is accountable for the money taken under subsection (a)(1)(A) because he aided and abetted the act of taking the money (the taking of money was the specific objective of the offense he joined). Defendant C is accountable for the injury to the teller under subsection (a)(1)(B) because the assault on the teller was within the scope and in furtherance of the jointly undertaken criminal activity (the robbery), and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).

As noted earlier, a defendant may be accountable for particular conduct under more than one subsection. In this example, Defendant C also is accountable for the money taken on the basis of subsection (a)(1)(B) because the taking of money was within the scope and in furtherance of the jointly undertaken criminal activity (the robbery), and was reasonably foreseeable (as noted, the taking of money was the specific objective of the jointly undertaken criminal activity).

**(C)** Requirements that the conduct of others be within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable.

**(i)** Defendant D pays Defendant E a small amount to forge an endorsement on an $800 stolen government check. Unknown to Defendant E, Defendant D then uses that check as a down payment in a scheme to fraudulently obtain $15,000 worth of merchandise. Defendant E is convicted of forging the $800 check and is accountable for the forgery of this check under subsection (a)(1)(A). Defendant E is not accountable for the $15,000 because the fraudulent scheme to obtain $15,000 was not within the scope of the jointly undertaken criminal activity (*i.e.,* the forgery of the $800 check).

**(ii)** Defendants F and G, working together, design and execute a scheme to sell fraudulent stocks by telephone. Defendant F fraudulently obtains $20,000. Defendant G fraudulently obtains $35,000. Each is convicted of mail fraud. Defendants F and G each are accountable for the entire amount ($55,000). Each defendant is accountable for the amount he personally obtained under subsection (a)(1)(A). Each defendant is accountable for the amount obtained by his accomplice under subsection (a)(1)(B) because the conduct of each was within the scope of the jointly undertaken criminal activity (the scheme to sell fraudulent stocks), was in furtherance of that criminal activity, and was reasonably foreseeable in connection with that criminal activity.

**(iii)** Defendants H and I engaged in an ongoing marihuana importation conspiracy in which Defendant J was hired only to help off-load a single shipment. Defendants H, I, and J are included in a single count charging conspiracy to import marihuana. Defendant J is accountable for the entire single shipment of marihuana he helped import under subsection (a)(1)(A) and any acts and omissions of others related to the importation of that shipment on the basis of subsection (a)(1)(B) (see the discussion in example (A)(i) above). He is not accountable for prior or subsequent shipments of marihuana imported by Defendants H or I because those acts were not within the scope of his jointly undertaken criminal activity (the importation of the single shipment of marihuana).

**(iv)** Defendant K is a wholesale distributor of child pornography. Defendant L is a retail-level dealer who purchases child pornography from Defendant K and resells it, but otherwise operates independently of Defendant K. Similarly, Defendant M is a retail-level dealer who purchases child pornography from Defendant K and resells it, but otherwise operates independently of Defendant K. Defendants L and M are aware of each other's criminal activity but operate independently. Defendant N is Defendant K's assistant who recruits customers for Defendant K and frequently supervises the deliveries to Defendant K's customers. Each defendant is convicted of a count charging conspiracy to distribute child pornography. Defendant K is accountable under subsection (a)(1)(A) for the entire quantity of child pornography sold to Defendants L and M. Defendant N also is accountable for the entire quantity sold to those defendants under subsection (a)(1)(B) because the entire quantity was within the scope of his jointly undertaken criminal activity (to distribute child pornography with Defendant K), in furtherance of that criminal activity, and reasonably foreseeable. Defendant L is accountable under subsection (a)(1)(A) only for the quantity of child pornography that he purchased from Defendant K because he is not engaged in a jointly undertaken criminal activity with the other defendants. For the same reason, Defendant M is accountable under subsection (a)(1)(A) only for the quantity of child pornography that he purchased from Defendant K.

**(v)**  Defendant O knows about her boyfriend's ongoing drug-trafficking activity, but agrees to participate on only one occasion by making a delivery for him at his request when he was ill. Defendant O is accountable under subsection (a)(1)(A) for the drug quantity involved on that one occasion. Defendant O is not accountable for the other drug sales made by her boyfriend because those sales were not within the scope of her jointly undertaken criminal activity (i.e., the one delivery).

**(vi)**  Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q, another street-level drug dealer, pools his resources and profits with four other street-level drug dealers. Defendant Q is engaged in a jointly undertaken criminal activity and, therefore, he is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking with them because those sales were within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity.

**(vii)**  Defendant R recruits Defendant S to distribute 500 grams of cocaine. Defendant S knows that Defendant R is the prime figure in a conspiracy involved in importing much larger quantities of cocaine. As long as Defendant S's agreement and conduct is limited to the distribution of the 500 grams, Defendant S is accountable only for that 500 gram amount (under subsection (a)(1)(A)), rather than the much larger quantity imported by Defendant R. Defendant S is not accountable under subsection (a)(1)(B) for the other quantities imported by Defendant R because those quantities were not within the scope of his jointly undertaken criminal activity (i.e., the 500 grams).

**(viii)**  Defendants T, U, V, and W are hired by a supplier to backpack a quantity of marihuana across the border from Mexico into the United States. Defendants T, U, V, and W receive their individual shipments from the supplier at the same time and coordinate their importation efforts by walking across the border together for mutual assistance and protection. Each defendant is accountable for the aggregate quantity of marihuana transported by the four defendants. The four defendants engaged in a jointly undertaken criminal activity, the object of which was the importation of the four backpacks containing marihuana (subsection (a)(1)(B)), and aided and abetted each other's actions (subsection (a)(1)(A)) in carrying out the jointly undertaken criminal activity (which under subsection (a)(1)(B) were also in furtherance of, and reasonably foreseeable in connection with, the criminal activity). In contrast, if Defendants T, U, V, and W were hired individually, transported their individual shipments at different times, and otherwise operated independently, each defendant would be accountable only for the quantity of marihuana he personally transported (subsection (a)(1)(A)). As this example illustrates, the scope of the jointly undertaken criminal activity may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities. See Application Note 3(B).

**5.** Application of Subsection (a)(2).

**(A)** Relationship to Grouping of Multiple Counts. "Offenses of a character for which § 3D1.2(d) would require grouping of multiple counts," as used in subsection (a)(2), applies to offenses for which grouping of counts would be required under § 3D1.2(d) had the defendant been convicted of multiple counts. Application of this provision does not require the defendant, in fact, to have been convicted of multiple counts. For example, where the defendant engaged in three drug sales of 10, 15, and 20 grams of cocaine, as part of the same course of conduct or common scheme or plan, subsection (a)(2) provides that the total quantity of cocaine involved (45 grams) is to be used to determine the offense level even if the defendant is convicted of a single count charging only one of the sales. If the defendant is convicted of multiple counts for the above noted sales, the grouping rules of Chapter Three, Part D (Multiple Counts) provide that the counts are grouped together. Although Chapter Three, Part D (Multiple Counts) applies to multiple counts of conviction, it does not limit the scope of subsection (a)(2). Subsection (a)(2) merely incorporates by reference the types of offenses set forth in § 3D1.2(d); thus, as discussed above, multiple counts of conviction are not required for subsection (a)(2) to apply.

As noted above, subsection (a)(2) applies to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, had the defendant been convicted of multiple counts. For example, the defendant sells 30 grams of cocaine (a violation of 21 U.S.C. § 841) on one occasion and, as part of the same course of conduct or common scheme or plan, attempts to sell an additional 15 grams of cocaine (a violation of 21 U.S.C. § 846) on another occasion. The defendant is convicted of one count charging the completed sale of 30 grams of cocaine. The two offenses (sale of cocaine and attempted sale of cocaine), although covered by different statutory provisions, are of a character for which § 3D1.2(d) would require the grouping of counts, had the defendant been convicted of both counts. Therefore, subsection (a)(2) applies and the total amount of cocaine (45 grams) involved is used to determine the offense level.

**(B)** "Same Course of Conduct or Common Scheme or Plan". "Common scheme or plan" and "same course of conduct" are two closely-related concepts.

**(i)** Common scheme or plan. For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi. For example, the conduct of five defendants who together defrauded a group of investors by computer manipulations that unlawfully transferred funds over an eighteen-month period would qualify as a common scheme or plan on the basis of any of the above listed factors; i.e., the commonality of victims (the same investors were defrauded on an ongoing basis), commonality of offenders (the conduct constituted an ongoing conspiracy), commonality of purpose (to defraud the group of investors), or similarity of modus operandi (the same or similar computer manipulations were used to execute the scheme).

**(ii)** Same course of conduct. Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be

considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity. The nature of the offenses may also be a relevant consideration (e.g., a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals).

**(C)** Conduct Associated with a Prior Sentence. For the purposes of subsection (a)(2), offense conduct associated with a sentence that was imposed prior to the acts or omissions constituting the instant federal offense (the offense of conviction) is not considered as part of the same course of conduct or common scheme or plan as the offense of conviction.

Examples:

**(1)** The defendant was convicted for the sale of cocaine and sentenced to state prison. Immediately upon release from prison, he again sold cocaine to the same person, using the same accomplices and modus operandi. The instant federal offense (the offense of conviction) charges this latter sale. In this example, the offense conduct relevant to the state prison sentence is considered as prior criminal history, not as part of the same course of conduct or common scheme or plan as the offense of conviction. The prior state prison sentence is counted under Chapter Four (Criminal History and Criminal Livelihood).

**(2)** The defendant engaged in two cocaine sales constituting part of the same course of conduct or common scheme or plan. Subsequently, he is arrested by state authorities for the first sale and by federal authorities for the second sale. He is convicted in state court for the first sale and sentenced to imprisonment; he is then convicted in federal court for the second sale. In this case, the cocaine sales are not separated by an intervening sentence. Therefore, under subsection (a)(2), the cocaine sale associated with the state conviction is considered as relevant conduct to the instant federal offense. The state prison sentence for that sale is not counted as a prior sentence; see § 4A1.2(a)(1).

Note, however, in certain cases, offense conduct associated with a previously imposed sentence may be expressly charged in the offense of conviction. Unless otherwise provided, such conduct will be considered relevant conduct under subsection (a)(1), not (a)(2).

**6.** Application of Subsection (a)(3).

**(A)** Definition of "Harm". "Harm" includes bodily injury, monetary loss, property damage and any resulting harm.

**(B)** Risk or Danger of Harm. If the offense guideline includes creating a risk or danger of harm as a specific offense characteristic, whether that risk or danger was created is to be considered in determining the offense level. See, e.g., § 2K1.4 (Arson; Property Damage by Use of Explosives); § 2Q1.2 (Mishandling of Hazardous or Toxic Substances or Pesticides). If, however, the guideline refers only to harm sustained (e.g., § 2A2.2 (Aggravated Assault); § 2B3.1 (Robbery)) or to actual, attempted or intended harm (e.g., § 2B1.1 (Theft, Property Destruction, and Fraud); § 2X1.1 (Attempt, Solicitation, or Conspiracy)), the risk created

enters into the determination of the offense level only insofar as it is incorporated into the base offense level. Unless clearly indicated by the guidelines, harm that is merely risked is not to be treated as the equivalent of harm that occurred. In a case in which creation of risk is not adequately taken into account by the applicable offense guideline, an upward departure may be warranted. See generally § 1B1.4 (Information to be Used in Imposing Sentence); § 5K2.0 (Grounds for Departure). The extent to which harm that was attempted or intended enters into the determination of the offense level should be determined in accordance with § 2X1.1 (Attempt, Solicitation, or Conspiracy) and the applicable offense guideline.

**7.** Factors Requiring Conviction under a Specific Statute. A particular guideline (in the base offense level or in a specific offense characteristic) may expressly direct that a particular factor be applied only if the defendant was convicted of a particular statute. For example, in § 2S1.1 (Laundering of Monetary Instruments; Engaging in Monetary Transactions in Property Derived from Unlawful Activity), subsection (b)(2)(B) applies if the defendant "was convicted under 18 U.S.C. § 1956". Unless such an express direction is included, conviction under the statute is not required. Thus, use of a statutory reference to describe a particular set of circumstances does not require a conviction under the referenced statute. An example of this usage is found in § 2A3.4(a)(2) ("if the offense involved conduct described in 18 U.S.C. § 2242").

Unless otherwise specified, an express direction to apply a particular factor only if the defendant was convicted of a particular statute includes the determination of the offense level where the defendant was convicted of conspiracy, attempt, solicitation, aiding or abetting, accessory after the fact, or misprision of felony in respect to that particular statute. For example, § 2S1.1(b)(2)(B) (which is applicable only if the defendant is convicted under 18 U.S.C. § 1956) would be applied in determining the offense level under § 2X3.1 (Accessory After the Fact) in a case in which the defendant was convicted of accessory after the fact to a violation of 18 U.S.C. § 1956 but would not be applied in a case in which the defendant is convicted of a conspiracy under 18 U.S.C. § 1956(h) and the sole object of that conspiracy was to commit an offense set forth in 18 U.S.C. § 1957. See Application Note 3(C) of § 2S1.1.

**8.** Partially Completed Offense. In the case of a partially completed offense (e.g., an offense involving an attempted theft of $800,000 and a completed theft of $30,000), the offense level is to be determined in accordance with § 2X1.1 (Attempt, Solicitation, or Conspiracy) whether the conviction is for the substantive offense, the inchoate offense (attempt, solicitation, or conspiracy), or both. See Application Note 4 in the Commentary to § 2X1.1. Note, however, that Application Note 4 is not applicable where the offense level is determined under § 2X1.1(c)(1).

**9.** Solicitation, Misprision, or Accessory After the Fact. In the case of solicitation, misprision, or accessory after the fact, the conduct for which the defendant is accountable includes all conduct relevant to determining the offense level for the underlying offense that was known, or reasonably should have been known, by the defendant.

*Background:* This section prescribes rules for determining the applicable guideline sentencing range, whereas § 1B1.4 (Information to be Used in Imposing Sentence) governs the range of information that the court may consider in adjudging sentence once the guideline sentencing range has been determined. Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range. The range of information that may be considered at sentencing is broader than the range of information upon which the applicable sentencing range is determined.

Subsection (a) establishes a rule of construction by specifying, in the absence of more explicit instructions in the context of a specific guideline, the range of conduct that is relevant to determining the applicable offense level (except for the determination of the applicable offense guideline, which is governed by § 1B1.2(a)). No such rule of construction is necessary with respect to Chapters Four and Five because the guidelines in those Chapters are explicit as to the specific factors to be considered.

Subsection (a)(2) provides for consideration of a broader range of conduct with respect to one class of offenses, primarily certain property, tax, fraud and drug offenses for which the guidelines depend substantially on quantity, than with respect to other offenses such as assault, robbery and burglary. The distinction is made on the basis of § 3D1.2(d), which provides for grouping together (i.e., treating as a single count) all counts charging offenses of a type covered by this subsection. However, the applicability of subsection (a)(2) does not depend upon whether multiple counts are alleged. Thus, in an embezzlement case, for example, embezzled funds that may not be specified in any count of conviction are nonetheless included in determining the offense level if they were part of the same course of conduct or part of the same scheme or plan as the count of conviction. Similarly, in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction. On the other hand, in a robbery case in which the defendant robbed two banks, the amount of money taken in one robbery would not be taken into account in determining the guideline range for the other robbery, even if both robberies were part of a single course of conduct or the same scheme or plan. (This is true whether the defendant is convicted of one or both robberies.)

Subsections (a)(1) and (a)(2) adopt different rules because offenses of the character dealt with in subsection (a)(2) (i.e., to which § 3D1.2(d) applies) often involve a pattern of misconduct that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing. For example, a pattern of embezzlement may consist of several acts of taking that cannot separately be identified, even though the overall conduct is clear. In addition, the distinctions that the law makes as to what constitutes separate counts or offenses often turn on technical elements that are not especially meaningful for purposes of sentencing. Thus, in a mail fraud case, the scheme is an element of the offense and each mailing may be the basis for a separate count; in an embezzlement case, each taking may provide a basis for a separate count. Another consideration is that in a pattern of small thefts, for example, it is important to take into account the full range of related conduct. Relying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach to writing workable guidelines for these offenses. Conversely, when § 3D1.2(d) does not apply, so that convictions on multiple counts are considered separately in determining the guideline sentencing range, the guidelines prohibit aggregation of quantities from other counts in order to prevent "double counting" of the conduct and harm from each count of conviction. Continuing offenses present similar practical problems. The reference to § 3D1.2(d), which provides for grouping of multiple counts arising out of a continuing offense when the offense guideline takes the continuing nature into account, also prevents double counting.

Subsection (a)(4) requires consideration of any other information specified in the applicable guideline. For example, § 2A1.4 (Involuntary Manslaughter) specifies consideration of the

defendant's state of mind; § 2K1.4 (Arson; Property Damage By Use of Explosives) specifies consideration of the risk of harm created.

## History

**HISTORY:**

Effective November 1, 1987. Amended effective January 15, 1988 (see Appendix C, amendment 3); November 1, 1989 (see Appendix C, amendments 76-78 and 303); November 1, 1990 (see Appendix C, amendment 309); November 1, 1991 (see Appendix C, amendment 389); November 1, 1992 (see Appendix C, amendment 439); November 1, 1994 (see Appendix C, amendment 503); November 1, 2001 (see Appendix C, amendments 617 and 634); November 1, 2004 (see Appendix C, amendment 674); November 1, 2010 (see Appendix C, amendment 746); November 1, 2015 (see Appendix C, amendments 790, 797).

Annotations

## NOTES TO DECISIONS

**I.IN GENERAL**

**1.Generally**

**2.Constitutionality**

**3.—Due process**

**4.Applicability**

**5.—Common scheme or plan**

**6.—Effective date**

**7.Relevant conduct**

**8.—Dismissed counts**

**9.—Prior convictions**

**10.Miscellaneous**

**II.DRUG OFFENSES**

**A.In General**

**11.Generally**

**12.Use of weapon**

Appendix B - U.S. v. Ramos, 22-10166

# 18 USCS Appx § 2K2.1, Part 1 of 2

Current through Public Law 117-327, approved December 27, 2022, with a gap of Public Law 117-263.

*United States Code Service  >  TITLE 18. CRIMES AND CRIMINAL PROCEDURE (§§ 1 — 6005)  >  18 USCS appendix  >  SENTENCING GUIDELINES FOR THE UNITED STATES COURTS  >  CHAPTER TWO. Offense Conduct  >  Part K. Offenses Involving Public Safety  >  2. Firearms*

## § 2K2.1. Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition

**(a)** Base Offense Level (Apply the Greatest):

**(1)** 26, if (A) the offense involved a (i) semiautomatic firearm that is capable of accepting a large capacity magazine; or (ii) firearm that is described in 26 U.S.C. § 5845(a); and (B) the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense;

**(2)** 24, if the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense;

**(3)** 22, if (A) the offense involved a (i) semiautomatic firearm that is capable of accepting a large capacity magazine; or (ii) firearm that is described in 26 U.S.C. § 5845(a); and (B) the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense;

**(4)** 20, if—

**(A)** the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense; or

**(B)** the (i) offense involved a (I) semiautomatic firearm that is capable of accepting a large capacity magazine; or (II) firearm that is described in 26 U.S.C. § 5845(a); and (ii) defendant (I) was a prohibited person at the time the defendant committed the instant offense; (II) is convicted under 18 U.S.C. § 922(d); or (III) is convicted under 18 U.S.C. § 922(a)(6) or § 924(a)(1)(A) and committed the offense with knowledge, intent, or reason to believe that the offense would result in the transfer of a firearm or ammunition to a prohibited person;

**(5)** 18, if the offense involved a firearm described in 26 U.S.C. § 5845(a);

**(6)** 14, if the defendant (A) was a prohibited person at the time the defendant committed the instant offense; (B) is convicted under 18 U.S.C. § 922(d); or (C) is convicted under 18 U.S.C. § 922(a)(6) or § 924(a)(1)(A) and committed the offense with knowledge, intent, or reason to believe that the offense would result in the transfer of a firearm or ammunition to a prohibited person;

**(7)** 12, except as provided below; or

**(8)** 6, if the defendant is convicted under 18 U.S.C. § 922(c), (e), (f), (m), (s), (t), or (x)(1), or 18 U.S.C. § 1715.

**(b)** Specific Offense Characteristics

**(1)**

If the offense involved three or more firearms, increase as follows:

| Number of Firearms | Increase in Level |
|---|---|
| (A) 3-7 ...................... | add 2. |
| (B) 8-24 ...................... | add 4. |
| (C) 25-99 ...................... | add 6. |
| (D) 100-199 ...................... | add 8. |
| (E) 200 or more ...................... | add 10. |

**(2)** If the defendant, other than a defendant subject to subsection (a)(1), (a)(2), (a)(3), (a)(4), or (a)(5), possessed all ammunition and firearms solely for lawful sporting purposes or collection, and did not unlawfully discharge or otherwise unlawfully use such firearms or ammunition, decrease the offense level determined above to level 6.

**(3)** If the offense involved—

**(A)** a destructive device that is a portable rocket, a missile, or a device for use in launching a portable rocket or a missile, increase by 15 levels; or

**(B)** a destructive device other than a destructive device referred to in subdivision (A), increase by 2 levels.

**(4)** If any firearm (A) was stolen, increase by 2 levels; or (B) had an altered or obliterated serial number, increase by 4 levels.

The cumulative offense level determined from the application of subsections (b)(1) through (b)(4) may not exceed level 29, except if subsection (b)(3)(A) applies.

**(5)** If the defendant engaged in the trafficking of firearms, increase by 4 levels.

**(6)** If the defendant—

**(A)** possessed any firearm or ammunition while leaving or attempting to leave the United States, or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be transported out of the United States; or

**(B)** used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense,

increase by 4 levels. If the resulting offense level is less than level 18, increase to level 18.

**(7)** If a recordkeeping offense reflected an effort to conceal a substantive offense involving firearms or ammunition, increase to the offense level for the substantive offense.

**(c)** Cross Reference

**(1)** If the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or ammunition cited in the offense of conviction with knowledge or intent that it would be used or possessed in connection with another offense, apply—

**(A)** § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above; or

**(B)** if death resulted, the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than that determined above.

Commentary

*Statutory Provisions:* 18 U.S.C. §§ 922(a)–(p), (r)–(w), (x)(1), 924(a), (b), (e)–(i), (k)–(o), 1715, 2332g; 26 U.S.C. § 5861(a)–(l). For additional statutory provisions, see Appendix A (Statutory Index).

*Application Notes:*

**1.** Definitions. For purposes of this guideline:

"Ammunition" has the meaning given that term in 18 U.S.C. § 921(a)(17)(A).

"Controlled substance offense" has the meaning given that term in § 4B1.2(b) and Application Note 1 of the Commentary to § 4B1.2 (Definitions of Terms Used in Section 4B1.1).

"Crime of violence" has the meaning given that term in § 4B1.2(a) and Application Note 1 of the Commentary to § 4B1.2.

"Destructive device" has the meaning given that term in 26 U.S.C. § 5845(f).

"Felony conviction" means a prior adult federal or state conviction for an offense punishable by death or imprisonment for a term exceeding one year, regardless of whether such offense is specifically designated as a felony and regardless of the actual sentence imposed. A conviction for an offense committed at age eighteen years or older is an adult conviction. A conviction for an offense committed prior to age eighteen years is an adult conviction if it is classified as an adult conviction under the laws of the jurisdiction in which the defendant was convicted (e.g., a federal conviction for an offense committed prior to the defendant's eighteenth birthday is an adult conviction if the defendant was expressly proceeded against as an adult).

"Firearm" has the meaning given that term in 18 U.S.C. § 921(a)(3).

**2.** Semiautomatic Firearm That Is Capable of Accepting a Large Capacity Magazine. For purposes of subsections (a)(1), (a)(3), and (a)(4), a "semiautomatic firearm that is capable of accepting a large capacity magazine" means a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the

firearm. This definition does not include a semiautomatic firearm with an attached tubular device capable of operating only with .22 caliber rim fire ammunition.

**3.** Definition of "Prohibited Person". For purposes of subsections (a)(4)(B) and (a)(6), "prohibited person" means any person described in 18 U.S.C. § 922(g) or § 922(n).

**4.** Application of Subsection (a)(7). Subsection (a)(7) includes the interstate transportation or interstate distribution of firearms, which is frequently committed in violation of state, local, or other federal law restricting the possession of firearms, or for some other underlying unlawful purpose. In the unusual case in which it is established that neither avoidance of state, local, or other federal firearms law, nor any other underlying unlawful purpose was involved, a reduction in the base offense level to no lower than level 6 may be warranted to reflect the less serious nature of the violation.

**5.** Application of Subsection (b)(1). For purposes of calculating the number of firearms under subsection (b)(1), count only those firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed, including any firearm that a defendant obtained or attempted to obtain by making a false statement to a licensed dealer.

**6.** Application of Subsection (b)(2). Under subsection (b)(2), "lawful sporting purposes or collection" as determined by the surrounding circumstances, provides for a reduction to an offense level of 6. Relevant surrounding circumstances include the number and type of firearms, the amount and type of ammunition, the location and circumstances of possession and actual use, the nature of the defendant's criminal history (e.g., prior convictions for offenses involving firearms), and the extent to which possession was restricted by local law. Note that where the base offense level is determined under subsections (a)(1) – (a)(5), subsection (b)(2) is not applicable.

**7.** Destructive Devices. A defendant whose offense involves a destructive device receives both the base offense level from the subsection applicable to a firearm listed in 26 U.S.C. § 5845(a) (e.g., subsection (a)(1), (a)(3), (a)(4)(B), or (a)(5)), and the applicable enhancement under subsection (b)(3). Such devices pose a considerably greater risk to the public welfare than other National Firearms Act weapons.

Offenses involving such devices cover a wide range of offense conduct and involve different degrees of risk to the public welfare depending on the type of destructive device involved and the location or manner in which that destructive device was possessed or transported. For example, a pipe bomb in a populated train station creates a substantially greater risk to the public welfare, and a substantially greater risk of death or serious bodily injury, than an incendiary device in an isolated area. In a case in which the cumulative result of the increased base offense level and the enhancement under subsection (b)(3) does not adequately capture the seriousness of the offense because of the type of destructive device involved, the risk to the public welfare, or the risk of death or serious bodily injury that the destructive device created, an upward departure may be warranted. See also §§ 5K2.1 (Death), 5K2.2 (Physical Injury), and 5K2.14 (Public Welfare).

**8.** Application of Subsection (b)(4).

    **(A)** Interaction with Subsection (a)(7). If the only offense to which § 2K2.1 applies is 18 U.S.C. § 922(i), (j), or (u), or 18 U.S.C. § 924(l) or (m) (offenses involving a stolen firearm or stolen ammunition) and the base offense level is determined under subsection (a)(7), do not apply the enhancement in subsection (b)(4)(A). This is because the base offense level takes

into account that the firearm or ammunition was stolen. However, if the offense involved a firearm with an altered or obliterated serial number, apply subsection (b)(4)(B).

Similarly, if the offense to which § 2K2.1 applies is 18 U.S.C. § 922(k) or 26 U.S.C. § 5861(g) or (h) (offenses involving an altered or obliterated serial number) and the base offense level is determined under subsection (a)(7), do not apply the enhancement in subsection (b)(4)(B). This is because the base offense level takes into account that the firearm had an altered or obliterated serial number. However, it the offense involved a stolen firearm or stolen ammunition, apply subsection (b)(4)(A).

**(B)** Knowledge or Reason to Believe. Subsection (b)(4) applies regardless of whether the defendant knew or had reason to believe that the firearm was stolen or had an altered or obliterated serial number.

**9.** Application of Subsection (b)(7). Under subsection (b)(7), if a record-keeping offense was committed to conceal a substantive firearms or ammunition offense, the offense level is increased to the offense level for the substantive firearms or ammunition offense (e.g., if the defendant falsifies a record to conceal the sale of a firearm to a prohibited person, the offense level is increased to the offense level applicable to the sale of a firearm to a prohibited person).

**10.** Prior Felony Convictions. For purposes of applying subsection (a)(1), (2), (3), or (4)(A), use only those felony convictions that receive criminal history points under § 4A1.1(a), (b), or (c). In addition, for purposes of applying subsection (a)(1) and (a)(2), use only those felony convictions that are counted separately under § 4A1.1(a), (b), or (c). See § 4A1.2(a)(2).

Prior felony conviction(s) resulting in an increased base offense level under subsection (a)(1), (a)(2), (a)(3), (a)(4)(A), (a)(4)(B), or (a)(6) are also counted for purposes of determining criminal history points pursuant to Chapter Four, Part A (Criminal History).

**11.** Upward Departure Provisions. An upward departure may be warranted in any of the following circumstances: (A) the number of firearms substantially exceeded 200; (B) the offense involved multiple National Firearms Act weapons (e.g., machineguns, destructive devices), military type assault rifles, non-detectable ("plastic") firearms (defined at 18 U.S.C. § 922(p)); (C) the offense involved large quantities of armor-piercing ammunition (defined at 18 U.S.C. § 921(a)(17)(B)); or (D) the offense posed a substantial risk of death or bodily injury to multiple individuals (see Application Note 7).

**12.** Armed Career Criminal. A defendant who is subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e) is an Armed Career Criminal. See § 4B1.4.

**13.** Application of Subsection (b)(5).

**(A)** In General. Subsection (b)(5) applies, regardless of whether anything of value was exchanged, if the defendant—

**(i)** transported, transferred, or otherwise disposed of two or more firearms to another individual, or received two or more firearms with the intent to transport, transfer, or otherwise dispose of firearms to another individual; and

**(ii)** knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual—

**(I)** whose possession or receipt of the firearm would be unlawful; or

**(II)** who intended to use or dispose of the firearm unlawfully.

**(B)** Definitions. For purposes of this subsection:

"Individual whose possession or receipt of the firearm would be unlawful" means an individual who (i) has a prior conviction for a crime of violence, a controlled substance offense, or a misdemeanor crime of domestic violence; or (ii) at the time of the offense was under a criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status. "Crime of violence" and "controlled substance offense" have the meaning given those terms in § 4B1.2 (Definitions of Terms Used in Section 4B1.1). "Misdemeanor crime of domestic violence" has the meaning given that term in 18 U.S.C. § 921(a)(33)(A).

The term "defendant", consistent with § 1B1.3 (Relevant Conduct), limits the accountability of the defendant to the defendant's own conduct and conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused.

**(C)** Upward Departure Provision. If the defendant trafficked substantially more than 25 firearms, an upward departure may be warranted.

**(D)** Interaction with Other Subsections. In a case in which three or more firearms were both possessed and trafficked, apply both subsections (b)(1) and (b)(5). If the defendant used or transferred one of such firearms in connection with another felony offense (i.e., an offense other than a firearms possession or trafficking offense) an enhancement under subsection (b)(6)(B) also would apply.

**14.** "Application of Subsections (b)(6)(B) and (c)(1)".

**(A)** In General. Subsections (b)(6)(B) and (c)(1) apply if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense or another offense, respectively. However, subsection (c)(1) contains the additional requirement that the firearm or ammunition be cited in the offense of conviction.

**(B)** Application When Other Offense is Burglary or Drug Offense. Subsections (b)(6)(B) and (c)(1) apply (i) in a case in which a defendant who, during the course of a burglary, finds and takes a firearm, even if the defendant did not engage in any other conduct with that firearm during the course of the burglary; and (ii) in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia. In these cases, application of subsections (b)(6)(B) and, if the firearm was cited in the offense of conviction, (c)(1) is warranted because the presence of the firearm has the potential of facilitating another felony offense or another offense, respectively.

**(C)** Definitions.

"Another felony offense", for purposes of subsection (b)(6)(B), means any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained.

"Another offense", for purposes of subsection (c)(1), means any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, regardless of whether a criminal charge was brought, or a conviction obtained.

**(D)** Upward Departure Provision. In a case in which the defendant used or possessed a firearm or explosive to facilitate another firearms or explosives offense (e.g., the defendant used or possessed a firearm to protect the delivery of an unlawful shipment of explosives), an upward departure under § 5K2.6 (Weapons and Dangerous Instrumentalities) may be warranted.

**(E)** Relationship Between the Instant Offense and the Other Offense. In determining whether subsections (b)(6)(B) and (c)(1) apply, the court must consider the relationship between the instant offense and the other offense, consistent with relevant conduct principles. See § 1B1.3(a)(1)–(4) and accompanying commentary.

In determining whether subsection (c)(1) applies, the court must also consider whether the firearm used in the other offense was a firearm cited in the offense of conviction.

For example:

**(i)** Firearm Cited in the Offense of Conviction. Defendant A's offense of conviction is for unlawfully possessing a shotgun on October 15. The court determines that, on the preceding February 10, Defendant A used the shotgun in connection with a robbery. Ordinarily, under these circumstances, subsection (b)(6)(B) applies, and the cross reference in subsection (c)(1) also applies if it results in a greater offense level.

Ordinarily, the unlawful possession of the shotgun on February 10 will be "part of the same course of conduct or common scheme or plan" as the unlawful possession of the same shotgun on October 15. See § 1B1.3(a)(2) and accompanying commentary (including, in particular, the factors discussed in Application Note 5(B) to § 1B1.3). The use of the shotgun "in connection with" the robbery is relevant conduct because it is a factor specified in subsections (b)(6)(B) and (c)(1). See § 1B1.3(a)(4) ("any other information specified in the applicable guideline").

**(ii)** Firearm Not Cited in the Offense of Conviction. Defendant B's offense of conviction is for unlawfully possessing a shotgun on October 15. The court determines that, on the preceding February 10, Defendant B unlawfully possessed a handgun (not cited in the offense of conviction) and used the handgun in connection with a robbery.

Subsection (b)(6)(B). In determining whether subsection (b)(6)(B) applies, the threshold question for the court is whether the two unlawful possession offenses (the shotgun on October 15 and the handgun on February 10) were "part of the same course of conduct or common scheme or plan". See § 1B1.3(a)(2) and accompanying commentary (including, in particular, the factors discussed in Application Note 5(B) to § 1B1.3).

If they were, then the handgun possession offense is relevant conduct to the shotgun possession offense, and the use of the handgun "in connection with" the robbery is relevant conduct because it is a factor specified in subsection (b)(6)(B). See § 1B1.3(a)(4) ("any other information specified in the applicable guideline"). Accordingly, subsection (b)(6)(B) applies.

On the other hand, if the court determines that the two unlawful possession offenses were not "part of the same course of conduct or common scheme or plan," then the handgun possession offense is not relevant conduct to the shotgun possession offense and subsection (b)(6)(B) does not apply.

Subsection (c)(1). Under these circumstances, the cross reference in subsection (c)(1) does not apply, because the handgun was not cited in the offense of conviction.

**15.** Certain Convictions Under 18 U.S.C. §§ 922(a)(6), 922(d), and 924(a)(1)(A). In a case in which the defendant is convicted under 18 U.S.C. §§ 922(a)(6), 922(d), or 924(a)(1)(A), a downward departure may be warranted if (A) none of the enhancements in subsection (b) apply, (B) the defendant was motivated by an intimate or familial relationship or by threats or fear to commit the offense and was otherwise unlikely to commit such an offense, and (C) the defendant received no monetary compensation from the offense.

## History

**HISTORY:**

Effective November 1, 1987. Amended effective November 1, 1989 (see Appendix C, amendment 189); November 1, 1990 (see Appendix C, amendment 333); November 1, 1991 (see Appendix C, amendment 374); November 1, 1992 (see Appendix C, amendment 471); November 1, 1993 (see Appendix C, amendment 478); November 1, 1995 (see Appendix C, amendment 522); November 1, 1997 (see Appendix C, amendments 568 and 575); November 1, 1998 (see Appendix C, amendments 578 and 586); November 1, 2000 (see Appendix C, amendment 605); November 1, 2001 (see Appendix C, amendments 629–631); November 1, 2002 (see Appendix C, amendment 646); November 1, 2004 (see Appendix C, amendment 669); November 1, 2005 (see Appendix C, amendment 679 and 680); November 1, 2006 (see Appendix C, amendments 686, 691, and 696); November 1, 2007 (see Appendix C, amendment 707); November 1, 2010 (see Appendix C, amendment 746); November 1, 2011 (see Appendix C, amendment 753); November 1, 2014 (see Appendix C, amendment 784); November 1, 2015 (see Appendix C, amendments 790, 797); November 1, 2016 (see Appendix C, amendment 804).

Annotations

## NOTES TO DECISIONS

**I.IN GENERAL**

**1.Generally**

**2.Constitutionality**

**3.Applicability**

**4.—Effective date of USSG or amendment**

**5.What constitutes firearm or destructive device**

**6.Double counting**

**7.Miscellaneous**

**II.INCREASE IN OFFENSE LEVEL**