No. 22-10166

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
————————————

**UNITED STATES OF AMERICA**,
PLAINTIFF-APPELLEE,

V.

**SABINO RAMOS**,
DEFENDANT-APPELLANT.
————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
D.C. NO. 1:21-CR-210-JLT
————————————

**ANSWERING BRIEF OF THE UNITED STATES**
————————————

PHILLIP A. TALBERT
United States Attorney

CAMIL A. SKIPPER
Assistant U.S. Attorney
Appellate Chief

AARON D. PENNEKAMP
Assistant U.S. Attorney
Eastern District of California
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2700

Attorneys for Appellee

TABLE OF CONTENTS

Table of Contents ....................................................................... i

Table of Authorities ................................................................ iii

Statement of Jurisdiction ........................................................ 1

Issue Presented for Review .................................................... 1

Bail Status................................................................................ 1

Statement of the Case.............................................................. 1

    I.  Ramos conceded that he was a felon who illegally
        possessed two firearms on the day of his arrest....................... 1

    II. Ramos possessed additional firearms even before
        his arrest. ...................................................................... 3

        A.  Law enforcement located images and text
            messages concerning firearms possession on one
            of Ramos's cell phones. .......................................... 3

        B.  Ramos also possessed two firearms in
            connection with an earlier shooting incident at
            an illegal casino. ..................................................... 4

    III.The district court found that Ramos's offense
        "involved" at least three firearms and sentenced
        him to a within-Guidelines term of imprisonment. ................. 8

Summary of Argument ........................................................ 12

Argument............................................................................... 13

    I.  The district court correctly applied a two-level
        enhancement because Ramos's felon-in-possession
        offense "involved" at least three firearms................................ 13

        A.  Standard of Review .......................................... 13

B.  The district court appropriately applied the
    preponderance standard when reviewing the
    evidence concerning Ramos's two-level
    enhancement. ....................................................... 14

C.  The district court did not clearly err when it
    found by a preponderance of the evidence that
    Ramos's offense "involved" at least three
    firearms.............................................................. 21

    1.  Ramos cannot dispute that his offense
        "involved" at least two firearms. ................................ 23

    2.  Ramos's pre-arrest text messages establish
        that he possessed at least one more firearm,
        and he has waived any claim to the contrary
        on appeal. ....................................................... 24

    3.  Ramos's offense also "involved" two more
        firearms based on his conduct during the
        shooting at the illegal casino........................................ 26

D.  The district court did not clearly err when it
    found that Ramos's repeated possession of
    firearms in 2021 constituted "relevant conduct"
    under the Sentencing Guidelines. ...................................... 33

Conclusion ................................................................ 40

Statement of Related Cases................................................. 41

Certificate of Compliance ................................................. 42

Certificate of Service...................................................... 43

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Easley v. Cromartie,*
    532 U.S. 234 (2001) ...........................................................................22

*Farrow v. United States,*
    580 F.2d 1339 (9th Cir. 1978) .........................................................33

*Rodriguez v. Hayes,*
    591 F.3d 1105 (9th Cir. 2010) .........................................................26

*United States v. Ali,*
    620 F.3d 1062 (9th Cir. 2010) .........................................................30

*United States v. Alonso,*
    48 F.3d 1536 (9th Cir. 1995) .....................................................28, 29

*United States v. Berry,*
    258 F.3d 971 (9th Cir. 2001) .....................................................32, 33

*United States v. Blitz,*
    748 Fed. Appx. 176 (9th Cir. 2019) ................................................31

*United States v. Booker,*
    543 U.S. 220 (2005) ...........................................................................21

*United States v. Cabaccang,*
    481 F.3d 1176 (9th Cir. 2007) .........................................................32

*United States v. Chee,*
    110 F.3d 1489 (9th Cir. 1997) .........................................................28

*United States v. Daychild,*
    357 F.3d 1082 (9th Cir. 2004) .........................................................39

*United States v. Fernandez-Vidana,*
    857 F.2d 673 (9th Cir. 1988) ...........................................................29

*United States v. Galloway,*
  976 F.2d 414 (8th Cir. 1992) ........................................................ 20

*United States v. Gasca-Ruiz,*
  852 F.3d 1167 (9th Cir. 2017) ...................................................... 13

*United States v. Hahn,*
  960 F.2d 903 (9th Cir. 1992) .................................................. 39, 40

*United States v. Hopper,*
  177 F.3d 824 (9th Cir. 1999) ........................................................ 15

*United States v. Hugs,*
  507 Fed. Appx. 738 (9th Cir. 2013) ............................................. 29

*United States v. Hymas,*
  780 F.3d 1285 (9th Cir. 2015) ...................................................... 19

*United States v. Johansson,*
  249 F.3d 848 (9th Cir. 2001) ........................................................ 19

*United States v. Kahlon,*
  38 F.3d 467 (9th Cir. 1994) .......................................................... 13

*United States v. Kama,*
  394 F.3d 1236 (9th Cir. 2005) ............................................ 24, 26, 36

*United States v. Lonich,*
  23 F.4th 881 (9th Cir. 2022) ................................................ passim

*United States v. Lucas,*
  70 F.4th 1218 (9th Cir. 2023) ...................................................... 21

*United States v. MacDonald,*
  992 F.2d 967 (9th Cir. 1993) ........................................................ 35

*United States v. Mezas de Jesus,*
  217 F.3d 638 (9th Cir. 2000) ........................................................ 19

*United States v. Parlor,*
  2 F.4th 807 (9th Cir. 2021) .................................................. passim

*United States v. Petty*,
  982 F.2d 1365 (9th Cir. 1993) ........................................................ 31

*United States v. Rosas*,
  615 F.3d 1058 (9th Cir. 2010) ........................................................ 22

*United States v. Spangle*,
  626 F.3d 488 (9th Cir. 2010) ....................................... 22, 27, 28, 39

*United States v. Stein*,
  127 F.3d 777 (9th Cir. 1997) ......................................................... 33

*United States v. Taylor*,
  97 F.3d 1360 (10th Cir. 1996) ........................................................ 37

*United States v. Trujillo*,
  402 Fed. Appx. 323 (9th Cir. 2010) .......................................... 24, 36

*United States v. Valle*,
  940 F.3d 473 (9th Cir. 2019) ......................................................... 18

*United States v. Watts*,
  519 U.S. 148 (1997) ..................................................................... 15

## STATUTES

18 U.S.C. § 922(g)(1) ............................................................ 2, 11, 34

18 U.S.C. § 3231 ..................................................................................... 1

28 U.S.C. § 1291 ..................................................................................... 1

## RULES

Fed. R. App. P. 4(b) ............................................................................... 1

## SENTENCING GUIDELINES

U.S.S.G. § 1B1.3.....................................................................34, 35, 36, 37

U.S.S.G. § 2K2.1(b)(1)(A) ............................................................ passim

U.S.S.G. § 6A1.3(a) .............................................................................28

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. Judgment was entered on June 24, 2022. *See* ER-3. Ramos filed a timely notice of appeal on July 1, 2022. *See* Fed. R. App. P. 4(b); ER-102. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUE PRESENTED FOR REVIEW

Whether the district court erred when it increased Ramos's offense level by two points after finding by a preponderance of the evidence that Ramos's felon-in-possession violation "involved" at least three firearms.

## BAIL STATUS

Ramos is serving the 92-month sentence imposed in this case. His projected release date is January 20, 2028.

## STATEMENT OF THE CASE

**I.      Ramos conceded that he was a felon who illegally possessed two firearms on the day of his arrest.**

On July 8, 2021, Sabino Ramos led police officers on a car chase on the highways surrounding Bakersfield, California. *See* PSR ⁋⁋ 7–8. Although the officers had activated their lights and sirens, Ramos refused to yield and, instead, weaved in and out of traffic at speeds

1

as high as 90 miles per hour. PSR ⁋ 7. Ramos eventually tried to exit the highway but he crashed on the offramp. *See* PSR ⁋ 8.

Ramos's accident did not stop his flight, however. He ran from the police on foot, escaping through a hole in a nearby fence and entering a shopping center parking lot. *See* PSR ⁋ 8. The officers followed Ramos, and they watched him discard a "black satchel" in the parking lot. PSR ⁋ 8. Ramos eventually tripped and fell, which allowed the officers to catch and arrest him. *See* PSR ⁋ 9. Following his arrest, the officers recovered Ramos's black satchel, which contained a loaded Ruger .357 revolver, along with an unserialized, Glock-19-style 9mm handgun. *See* PSR ⁋ 9; ER-98, 100. Notably, officers also located two cell phones in Ramos's abandoned car. *See* PSR ⁋ 9.

Following his arrest, the government charged Ramos by way of an indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). *See* ER-100–01. Ramos pleaded guilty to this charge without a plea agreement in December 2022. *See* ER-80–99. As part of his guilty plea, Ramos conceded that he had illegally possessed two firearms; specifically, the Ruger .357

revolver and the Glock-style 9mm handgun that were found in his discarded black satchel.  *See* ER-86; *see also* AOB at 8 (acknowledging that Ramos "accepted responsibility" for "the two firearms with which he was arrested" (emphasis omitted)).

## II.   Ramos possessed additional firearms even before his arrest.

Ramos's car and foot chase was not his first incident involving firearms in 2021.  Instead, the evidence gathered by the government in advance of Ramos's sentencing showed that he had—on several occasions close in time to his July arrest—possessed additional firearms despite being a prohibited felon.

### A.   Law enforcement located images and text messages concerning firearms possession on one of Ramos's cell phones.

For example, law enforcement searched one of the cell phones that the Bakersfield P.D. had found in Ramos's abandoned car and found numerous pictures of firearms.  *See* PSR ⁋ 15; *see also* ER-36–37, 40–49 (sentencing memorandum and exhibits showing firearm photographs found on Ramos's cell phone).

In addition to photographs, Ramos's phone contained several damning WhatsApp and Viber[1] text and photo messages related to firearms from the week before his arrest. On July 5, for example, Ramos messaged another individual to admit that he "[j]ust bought a nice clean ghost," and Ramos followed that message with a picture of what appears to be a P80 ghost gun. PSR ⁋ 12; *see also* ER-36, 46. Similarly, on July 4, Ramos communicated with an individual known as "Rory Legs," who sent Ramos a photo of a handgun and quoted the price as "900." ER-36, 46. Ramos responded, "We want it." ER-45. Finally, on June 30, "Rory Legs" messaged Ramos to tell him that "[t]he guns here" and that he "got him down to 650," which prompted Ramos to say, "Ok let me snatch it up." PSR ⁋ 16; *see also* ER-36, 44.

### B. Ramos also possessed two firearms in connection with an earlier shooting incident at an illegal casino.

The evidence of Ramos's repeated gun possession did not stop there. Indeed, the government produced additional evidence that

---

[1] WhatsApp and Viber are cell phone applications that allow users to, among other things, send and receive text messages, photographs, and videos. *See* PSR ⁋⁋ 12 n.4 & 13 n.5.

Ramos possessed firearms not just in June and July, but also on May 5, 2021. That day, officers with the Bakersfield P.D. responded to reports of a shooting at an illegal gaming casino. *See* PSR ⁋ 5; SER-8. Bakersfield's "Shot Spotter" system had activated due to "volleys of gunfire," and the Bakersfield P.D. Communications Center received a 911 call about a gunshot victim. SER-8; *see also* PSR ⁋ 5. When officers arrived, they found Jesus Torres, who was wearing a tactical vest and had two gunshot wounds. *See* SER-8; PSR ⁋ 5. Torres claimed that he was a security guard and that several suspects had entered the business and begun shooting. *See* SER-8; *see* PSR ⁋ 5.

This story did not prove to be entirely accurate, however. Detective Nicholas Benevente—a ten-year veteran of the Bakersfield P.D.—reviewed security camera footage from the shooting. He learned several important facts based on that footage:

First, the footage revealed that Torres was not, in fact, a security guard, but was, instead, part of a group of individuals who entered the illegal gaming casino together with the apparent intent to rob the establishment. *See* PSR ⁋ 6; *see also* SER-9–10.

5

Second, Det. Benevente was able to identify Sabino Ramos as one of the individuals who entered the casino with Torres. *See* PSR ⊩ 6; SER-9. As Det. Benevente explained, he was familiar with Ramos from a previous shooting investigation, where Ramos was the victim. SER-9; PSR ⊩ 6 & n.1; *see also* PSR ⊩ 63. Moreover, Det. Benevente had seen Ramos in early July 2021 in Bakersfield.[2] *See* SER-9. Given these recent, in-person observations, Det. Benevente knew that Ramos had distinctive features—including his nose and particular hairstyle—and thus Det. Benevente recognized Ramos in the security camera footage, despite the fact that he appeared to be wearing a face mask that covered his mouth. *See* SER-9 (noting that Det. Benevente "was able to get a clear side profile of [Ramos] from the surveillance footage").

Third, although Ramos raises his sweatshirt's hood prior to entering the illegal casino (which prevented further observation of

---

[2] Det. Benevente summarized his observations from the security camera footage in a search warrant affidavit written in July 2021. *See* SER-3. As a result, Det. Benevente was able to compare his July in-person observations of Ramos to his observations of Ramos as he is depicted in the May security camera footage.

his distinctive facial features on the available security cameras), Det. Benevente nevertheless was able to track Ramos's movements inside the casino based on Ramos's clothing. *See* SER-9. That is, Det. Benevente saw that Ramos wore a light-colored, hooded sweatshirt, dark jeans, a black face covering, and white shoes with dark shoe laces—a footwear color combination that distinguished Ramos from the other individuals seen in the camera footage. SER-9; *see also* ER-16 (district court noting this footwear).

And fourth, the camera footage established that Ramos was carrying two black firearms. *See* PSR ¶ 6; SER-9. Specifically, the footage showed that Ramos points two firearms toward a door in the casino, then turns one of the firearms on its side. Based on his training and experience with firearms, Det. Benevente recognized this action as Ramos's attempt to clear a "malfunction" after the firearm failed to fire. SER-9–10; *see* PSR ¶ 6. Around this same time, another camera captured a flash of light, which Det. Benevente believed to be a ricochet or muzzle flash. *See* SER-9; PSR ¶ 6.

7

**III.   The district court found that Ramos's offense "involved" at least three firearms and sentenced him to a within-Guidelines term of imprisonment.**

The PSR calculated Ramos's total offense level in light of this evidence.  His base offense level (all agreed) was 22, *see* PSR ⁋ 24; his offense level (all agreed) was increased by two points because he had obstructed justice by recklessly fleeing from the police and weaving through traffic during the car chase, *see* PSR ⁋ 29, AOB at 7 n.1; and all agreed that Ramos should receive the benefit of a three-level decrease for acceptance of responsibility, *see* PSR ⁋⁋ 32–33.  The only disputed issue before the sentencing court was whether Ramos's offense level should be increased by an additional two points under Sentencing Guidelines Section 2K2.1(b)(1)(A) because the entirety of his relevant conduct "involved" at least three firearms.  *See* PSR ⁋ 26; *see also* ER-55–61.

Regarding that enhancement, the court considered the parties' arguments,[3] the appropriate standard of review, and the available

---

[3] Both parties briefed and argued the Section 2K2.1(b)(1)(A) issue prior to sentencing.  *See* ER-14–19, 34–38, 50–62.  Moreover, at Ramos's sentencing hearing, defense counsel made clear that Ramos

evidence before concluding that Ramos's offense involved at least three firearms. As to the evidentiary standard, the court found that the facts supporting the disputed enhancement needed to be found only by a preponderance of the evidence—and not by the higher "clear and convincing standard"—because the two-level increase would not have an "extreme[ly] disproportion[ate] affect" on Ramos's felon-in-possession sentence. ER-21.

Moreover, the court found that the government had met its "preponderance" burden. It determined that the government's evidence was "sufficiently reliable" to support the finding that Ramos possessed three or more firearms, and it highlighted some of the evidence in the record. ER-21. For example, the court credited much of the information recovered from Ramos's cell phone.[4] In fact, it

---

was not seeking testimony prior to sentencing, and that he wanted to proceed with sentencing on the papers. *See* ER-12.

[4] Although the district court considered the photographs of firearms pulled from Ramos's cell phone "interesting," it declined to "rely[] upon" those photographs "at this time." ER-20. The government nevertheless maintains that these photographs are additional facts establishing that Ramos possessed multiple firearms even before arrest. *See, e.g.*, ER-19 (government arguing that "the photograph that's depicted in Exhibit B is, in fact, Mr. Ramos holding a handgun with a high-capacity magazine").

explicitly "consider[ed] the WhatsApp communications in which it appears that on two occasions [in June and July 2021] . . . Ramos was intent on purchasing" firearms.  ER-20.  Based on those messages, the court found that Ramos was "communicating with someone about buying two guns" during this time period—"one for [] $650 and one for $900."  ER-20.  And before making its number-of-firearms finding, the court specifically referenced Ramos's July 5 message, "in which [he] reports having purchased or having in his possession a ghost gun."  ER-20.

Aside from Ramos's text messages, the court also credited Det. Benevente's summary of the surveillance camera footage from the casino shooting.  *See* ER-19–20.  Given Det. Benevente's sworn statements, and based on its own review of the available surveillance footage, the court concluded, for example:  that Det. Benevente was able to recognize Ramos from previous interactions; that the available footage supported Det. Benevente's identification of Ramos (including by showing his "distinctive" nose and brow line); and that Ramos's clothing and shoes as seen outside the casino uniquely

10

matched the clothing and shoes of the person holding two firearms while inside the casino. *See* ER-15–16, 19–20.

Finally, the court found that these additional, repeated instances of illegal firearm possession in May, June, and July 2021 amounted to "relevant conduct" for purposes of sentencing Ramos for his admitted violation of 18 U.S.C. § 922(g)(1). As the court explained, the evidence established that Ramos possessed multiple firearms just days or weeks before his arrest. *See* ER-21; *see also* PSR ⁋ 26 (concluding that Ramos's conduct at the casino shooting should be considered relevant conduct because the "separate events share similarity, repetition, and are in temporal proximity to one another").

As a result, the court overruled Ramos's objection, adopted the findings in the PSR, applied the two-level enhancement under Section 2K2.1(b)(1)(A), and concluded that Ramos's total offense level was 23. *See* ER-23–24. Because Ramos fell into criminal history category V, the court calculated that Ramos's advisory range was between 84 and 105 months in prison. *See* ER-24. Although the PSR recommended a 105-month sentence, the court ultimately imposed a

sentence toward the bottom of the range: 92 months. *See* ER-31; PSR at 21–22.

## SUMMARY OF ARGUMENT

The district court did not err when it applied a two-level enhancement under Section 2K2.1(b)(1)(A) of the Sentencing Guidelines. Because that two-level increase only modestly affected Ramos's recommended sentencing range, the government needed to prove the facts underlying the enhancement by a preponderance of the evidence—not some higher evidentiary standard. Nor did the court clearly err when it found that the government met its burden: An experienced police officer's sworn affidavit, text messages from Ramos's cell phone, and still frames of security camera footage all established that Ramos illegally possessed at least three firearms in May, June, and July 2021. Finally, for similar reasons, it was not clear error for the court to consider Ramos's repeated instances of illegal firearm possession to be "relevant conduct" under Section 1B1.3(a)(2), and thus Ramos's sentence should be affirmed.

**ARGUMENT**

**I.** **The district court correctly applied a two-level enhancement because Ramos's felon-in-possession offense "involved" at least three firearms.**

### A. Standard of Review

"A district court's decision to apply (or not apply) a particular provision of the Sentencing Guidelines involves three distinct components," each of which comes with a different standard of appellate review. *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1170 (9th Cir. 2017) (en banc). First, this Court will "review the district court's identification of the correct legal standard [regarding a Sentencing Guidelines issue] *de novo*." *Id.* Second, this Court reviews "the district court's factual findings [related to sentencing] for clear error." *Id.*; *see United States v. Kahlon*, 38 F.3d 467, 469, 470 (9th Cir. 1994) (noting that clear error review governs "[a] district court's factual determination that conduct is 'relevant conduct' within the meaning of . . . the Sentencing Guidelines"). And third, this Court reviews "a district court's application of the Sentencing Guidelines to the facts of a given case . . . for abuse of discretion." *Gasca-Ruiz*, 852 F.3d at 1170.

13

**B.**   **The district court appropriately applied the preponderance standard when reviewing the evidence concerning Ramos's two-level enhancement.**

As the district court correctly found, the government's burden at sentencing was to prove by a preponderance of the evidence that Ramos possessed three or more firearms under Section 2K2.1(b)(1)(A).  *See* ER-21.  That provision directs courts to add two points to a defendant's offense level when the offense "involved" the unlawful possession of at least three but not more than seven firearms.  *See* U.S.S.G. § 2K2.1(b)(1)(A) & cmt. n.5.

The law governing the district court's factual findings on this score is well established.  "As a general rule, factual findings underlying a sentencing enhancement need only be found by a preponderance of the evidence."  *United States v. Parlor*, 2 F.4th 807, 816 (9th Cir. 2021) (internal quotation marks omitted).  The exception is when a challenged enhancement has "an extremely disproportionate effect on the defendant's sentence relative to the offense of conviction"; in those cases, the factual findings must be based on clear and convincing evidence.  *Id.* (internal quotation marks omitted).  That "extremely disproportionate" analysis

14

primarily turns on two factors: "whether the enhanced sentence is four or more offense levels higher"; and whether the enhanced sentence is "more than double the initial sentencing range." *United States v. Lonich*, 23 F.4th 881, 911 (9th Cir. 2022).

Here, neither factor counsels in favor of a heightened evidentiary standard. Ramos's sentence was not, for example, "four or more offense levels higher" after application of the challenged sentencing enhancement. Instead, the only sentencing enhancement that Ramos challenges on appeal added just two points to his offense level. *See* U.S.S.G. § 2K2.1(b)(1)(A); AOB at 7 n.1. Because this two-level enhancement did not have an "extremely disproportionate" impact on Ramos's sentence, the district court correctly applied the usual preponderance standard, and Ramos's sentence should be affirmed. *See United States v. Watts*, 519 U.S. 148, 156–57 (1997) (holding that a two-level increase did not present the kind of "exceptional circumstances" that might require a heightened burden of proof); *United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999) (holding that a "four-level increase . . . is not an exceptional case that requires clear and convincing evidence").

That conclusion is especially true in this case, where the Section 2K2.1(b)(1)(A) enhancement did not come anywhere close to "doubl[ing]" Ramos's "initial sentencing range." *Lonich*, 23 F.4th at 911. Without the challenged enhancement, Ramos's final offense level would have been 21, which—when combined with his criminal history classification—produces a recommended sentencing range of 70 to 87 months in prison. That recommended range is not so different from the 84-to-105-month range calculated in the PSR. *See* PSR ⁋ 82. Indeed, far from doubling Ramos's guideline range, the Section 2K2.1(b)(1)(A) enhancement merely increased his recommended periods of imprisonment by 14 months (at the low end of the Guidelines) and 18 months (at the high end). In light of these modest increases, the court correctly applied the preponderance standard to the challenged enhancement, and Ramos's sentence should be affirmed. *See Lonich*, 23 F.4th at 912 ("[D]istrict courts may apply a preponderance of the evidence standard . . . when the sentence did *not* otherwise double.").

Because the two factors that drive this Court's "extremely disproportionate" impact analysis support the preponderance-of-the-

evidence standard, Ramos largely ignores those factors. Instead, he chooses to focus on "other factors employed by this Court in assessing the appropriate standard of proof." AOB at 15–16. As relevant to this appeal, those "other factors" include: (1) "whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment"; (2) "whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment"; and (3) "whether the facts offered in support of the enhancement create new offenses requiring separate punishment."[5] *Lonich*, 23 F.4th at 910–11 (internal quotation marks and brackets omitted).

But these "other factors" do not help Ramos. For one thing, as this Court repeatedly has acknowledged, the bulk of these other factors have been "eclipsed by subsequent developments in Sixth Amendment case law," making them irrelevant to the appropriate

---

[5] The full list of factors described in this Court's precedents includes one more consideration: "[W]hether the increase in sentence is based on the extent of a conspiracy." *Lonich*, 23 F.4th at 911. But Ramos was not charged with a conspiracy in this case, and no party contends that this factor is relevant to his appeal. *See* AOB at 16.

burden of proof. *Id.* at 911. As a result, this Court routinely ignores these other factors, choosing—as described above—to "'focus[] entirely on how enhancements increased both the offense level and the length of the recommended Guidelines range.'" *Parlor*, 2 F.4th at 817 (quoting *United States v. Valle*, 940 F.3d 473, 479 (9th Cir. 2019)). Because Ramos's appeal relies exclusively on factors that "do little independent work in driving the [standard-of-proof] analysis," this Court should affirm the district court's use of the preponderance standard. *Lonich*, 23 F.4th at 911.

Regardless, even taken on their own terms, Ramos's "other factors" do not require a heightened evidentiary standard with respect to the Section 2K2.1(b)(1)(A) enhancement. As to the first factor: The enhancement merely increased the high end of Ramos's recommended guideline range to 105 months. Even a top-of-the-range sentence would therefore fall well short of "the maximum sentence for the crime alleged in the indictment," which is 120 months. *Id.* at 910; *see* PSR ¶ 81 (describing the statutory maximum for Ramos's felon-in-possession offense). The first factor thus cannot affect this Court's "extremely disproportionate" analysis.

The second factor is similarly irrelevant. Because Ramos pleaded guilty to the indictment's sole count, the court's fact-finding at sentencing could not possibly "negate[] the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment." *Lonich*, 23 F.4th at 910; *see* ER-97–99. Indeed, in light of Ramos's plea, the second factor is "inapplicable" and cannot support his argument in favor of a heightened standard of proof. *United States v. Johansson*, 249 F.3d 848, 854 (9th Cir. 2001).

And as to the third factor: Just because a sentencing enhancement is based on uncharged conduct does not mean that the enhancement creates a "new offense[] requiring" a greater burden of proof. *Lonich*, 23 F.4th at 910. Instead, the question remains whether that "uncharged" conduct or "new offense" resulted in a substantial offense-level increase and "more than doubled the Guidelines imprisonment range." *United States v. Hymas*, 780 F.3d 1285, 1291–92 (9th Cir. 2015); *see also United States v. Mezas de Jesus*, 217 F.3d 638, 645 (9th Cir. 2000) (requiring a heightened standard of proof at sentencing only because the "uncharged kidnaping . . . became the quintessential tail which wags the dog of

19

the substantive offense" (internal quotation marks omitted)).  Here,

Section 2K2.1(b)(1)(A) only modestly affected Ramos's sentence.  The

court therefore correctly applied the preponderance standard, and

this Court should affirm.

Perhaps because all of this Circuit's "extraordinarily

disproportionate" factors favor the preponderance standard, Ramos

asks this Court to adopt a new rule that is entirely divorced from the

usual multi-factor analysis.  Under his rule, "[t]he sentencing

standard of proof should be clear and convincing evidence when it

goes to uncharged criminal conduct that a defendant denies."  AOB

at 14 (emphasis omitted).

But no court has adopted Ramos's preferred rule.  Instead, the

cases that Ramos cites all reflect this Court's well-established rule:

That is, sentencing courts may apply a heightened standard of proof

only "'if the punishment meted out following application of the

sentencing factors overwhelms or is extremely disproportionate to

the punishment that would otherwise be imposed.'"  AOB at 19

(quoting *United States v. Galloway*, 976 F.2d 414, 425–26 (8th Cir.

1992) (en banc)).  Rather than accept Ramos's invitation to rewrite

this Court's binding sentencing jurisprudence, then, this Court

should apply its usual rules and affirm Ramos's sentence, because

his felon-in-possession offense "involved" at least three firearms by a

preponderance of the evidence.[6]

### C. The district court did not clearly err when it found by a preponderance of the evidence that Ramos's offense "involved" at least three firearms.

Next, there was nothing clearly erroneous about the district

court's finding that—by a preponderance of the evidence—Ramos

possessed at least three firearms for purposes of the two-level

---

[6] Notably, this Circuit is the only Circuit that—post-*United States v. Booker*, 543 U.S. 220 (2005)—continues to require clear and convincing evidence for sentencing enhancements that have an "extremely disproportionate" effect on a defendant's sentence. *See United States v. Lucas*, 70 F.4th 1218, 1221–22 (9th Cir. 2023) (collecting cases and conceding that "this court stands alone in continuing to apply [its heightened evidentiary standard] rule after *Booker*"). Instead, following *Booker*, every other Circuit requires only a preponderance showing for factual findings relevant to sentencing. *See id.* Given this shifting post-*Booker* precedent, the government disagrees with this Court's continued use of the clear-and-convincing standard for Guidelines determinations and submits that the due process concerns motivating a heightened evidentiary standard no longer exist. *See United States v. Lucas*, no. 22-50064 (9th Cir.) at CR 46 (government supplemental brief filed in response to an order noting that "[a] judge of this court has called for a vote to determine whether [*Lucas*] should be reheard en banc").

enhancement under Section 2K2.1(b)(1)(A).  "Under the clear error standard," this Court will "give the district court a great degree of deference, reversing only if [it] come[s] to a 'definite and firm conviction that a mistake has been committed.'"  *United States v. Rosas*, 615 F.3d 1058, 1066 (9th Cir. 2010) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)).  That is a high bar.  "In order to reverse a district court's factual findings as clearly erroneous, [this Court] must determine that the . . . findings were illogical, implausible, or without support in the record."  *United States v. Spangle*, 626 F.3d 488, 497 (9th Cir. 2010).

Here, the record reveals no such error in the court's factual findings.  Indeed:  (1) Ramos concedes that he was arrested with two firearms; (2) Ramos has declined to challenge on appeal the court's finding that his pre-arrest text messages establish that he possessed at least one more firearm; and, in any event, (3) the preponderance of the evidence showed that Ramos possessed two additional firearms during the shooting at the illegal casino.  The court therefore correctly applied the two-level enhancement to Ramos's offense level, and his 92-month sentence should be affirmed.

### 1. Ramos cannot dispute that his offense "involved" at least two firearms.

As a preliminary matter, there is no dispute that Ramos's felon-in-possession offense involved at least two firearms. After all, he pleaded guilty to the sole count in the government's indictment, which alleged that on or about July 8, 2021, he possessed a Ruger SP 101 .357 revolver. *See* ER-97–98, 100. Moreover, Ramos did not challenge the factual summary contained in paragraph 9 of the PSR, which explained that—in addition to the Ruger revolver—Ramos possessed a Glock 19-style polymer 9mm handgun, which officers found in Ramos's satchel. *See* PSR ⁋ 9; *see also* AOB at 6–7, 8 (acknowledging that "Ramos specifically limited his admission [at his change-of-plea hearing] to two firearms"). For purposes of the two-level enhancement, the question for the court therefore was whether Ramos's offense "involved" just one more firearm. U.S.S.G. § 2K2.1(b)(1)(A) (requiring a two-level increase for offenses involving "3–7" firearms).

2.    **Ramos's pre-arrest text messages establish that he possessed at least one more firearm, and he has waived any claim to the contrary on appeal.**

There also appears to be no dispute on appeal that Ramos's offense involved at least a third firearm beyond the two that were in his possession on the night of his arrest. "Generally, an issue is waived when the appellant does not specifically and distinctly argue the issue in his or her opening brief." *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005). And here, Ramos has declined to "specifically and distinctly" challenge the court's conclusion that his WhatsApp and Viber communications establish that he possessed additional firearms before his arrest. This Court should therefore deem any such argument waived and may affirm Ramos's sentence on this ground alone. *See United States v. Trujillo*, 402 Fed. Appx. 323, 324 (9th Cir. 2010) (affirming sentence because defendant failed to challenge all "three alternative grounds [given by the court] for imposing two additional criminal points").

Specifically, in reaching its conclusion concerning the total number of firearms involved in Ramos's offense, the court made clear that it was "considering the WhatsApp communications" found on

24

Ramos's phone, in which Ramos negotiates the purchase of two firearms—one on June 30, 2021, and one a few days later on July 4 and 5.[7]  ER-20; *see also* ER-36, 44–46 (sentencing memorandum and exhibits summarizing Ramos's text messages); PSR ¶¶ 12, 16.  As the court concluded, these communications showed that "Ramos was intent on purchasing" firearms, and that he had, in fact, admitted to "having purchased or having in his possession a ghost gun."  ER-20.  And importantly for present purposes, the court found that these communications contributed to the preponderance of the evidence establishing that Ramos possessed more than just the two firearms found during his arrest.  *See* ER-20–21.

Ramos makes no effort to challenge this factual finding on appeal.  Instead, Ramos appears to have abandoned any such challenge.  *Compare* ER-14 (trial counsel arguing that Ramos's text

---

[7] The transcript of the sentencing hearing indicates that the court referred to a set of communications from "July 30th."  ER-20.  The court misspoke, however, as its references to "July 30th" communications on WhatsApp plainly were intended to describe the June 30, 2021 Viber text-message exchange summarized in the PSR and attached to the government's sentencing memorandum.  *See* PSR ¶ 16; ER-36, 44.

messages about "the possession of firearms" are just "discussion" and "don't establish that [Ramos] actually ever possessed those firearms"). Because Ramos declined to challenge the court's text-message-related factual findings on appeal, this Court should deem any such argument waived. *See Kama*, 394 F.3d at 1238. And because Ramos has failed to challenge each of the reasons given for the court's Section 2K2.1(b)(1)(A) offense-level enhancement, this Court should affirm Ramos's 92-month sentence. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1118 n.6 (9th Cir. 2010) (noting that "failure of a party in its opening brief to challenge an alternative ground for a district court's ruling given by the district court waives that challenge") (emphasis omitted).

> **3.    Ramos's offense also "involved" two more firearms based on his conduct during the shooting at the illegal casino.**

Regardless, even forgiving Ramos's waiver, this Court should affirm. The district court did not clearly err when it found by a preponderance of the evidence that Ramos possessed not only the two firearms found in his satchel on the night of his arrest, but also the two additional firearms he used during the casino shooting incident a

few weeks earlier. Put differently, nothing about the court's fact-finding concerning the casino shooting was "illogical, implausible, or without support in the record," and thus this Court should affirm. *Spangle*, 626 F.3d at 497.

Indeed, before making its findings, the court closely reviewed the evidence. *See* ER-15–17, 19–21 (sentencing colloquy discussing the evidence related to the shooting at an illegal casino). For example, the court examined in detail two still frames from the surveillance footage at the casino, noting, among other things, the kinds of clothing worn by the people depicted in the footage. Based on this detailed review, the court found that the person seen holding two firearms inside the casino was—by a preponderance of the evidence—the same person with Ramos's shoes and "distinctive" facial features seen outside the casino minutes earlier. *See* ER-16–17, 19–20; *see also* ER-51, 52.

To reach this conclusion, the court did not solely rely on its own analysis of the available surveillance footage. Instead, the court also considered the facts discussed in Det. Benevente's search warrant affidavit, finding by a preponderance of the evidence that "Benevente

was able to recognize [] Ramos from previous contacts" as the person holding two firearms in the casino video footage. ER-19–20; *see also* SER-9–10. The court's findings were, in short, grounded in a careful review of the evidence. Those findings therefore cannot be "clearly erroneous" as this Court has defined that term. *See, e.g.*, *Spangle*, 626 F.3d at 497 (rejecting the defendant's invitation "to reweigh the evidence presented to the trial court," and, instead, deferring to the district court's "plausible" factual findings).

Ramos disagrees. He first argues that Det. Benevente's search warrant affidavit was insufficiently "reliable" to support the court's factual findings concerning the casino shooting. *See* AOB at 17–18. But that is wrong. Sentencing courts have broad discretion to credit hearsay statements (like those found in sworn affidavits) at sentencing, so long as the statements reflect "some minimal indicia of reliability." *United States v. Chee*, 110 F.3d 1489, 1492 (9th Cir. 1997) (internal quotation marks omitted); *see also* U.S.S.G. § 6A1.3(a) & cmt. (similar); *United States v. Alonso*, 48 F.3d 1536, 1546–47 (9th Cir. 1995) (approving of sentencing court's use of hearsay statements in an affidavit to support a factual finding).

28

Indeed, "[o]nly when hearsay is so inadequately supported that the factual basis for believing it is almost nil can it be argued that the evidence should not have been considered." *United States v. Fernandez-Vidana*, 857 F.2d 673, 675 (9th Cir. 1988).

That is not this case. Instead, for several reasons, the information contained in Det. Benevente's affidavit exhibited more than enough "indicia of reliability" to warrant consideration at Ramos's sentencing. *See* ER-19–21 (district court's reliability finding). First, as a general matter, Det. Benevente made the statements in his search warrant affidavit "under penalty of perjury," ER-20—a fact that is indicative of the statements' reliability for purposes of sentencing. *See Alonso*, 48 F.3d at 1546–47 (concluding that "a sworn statement of an officer of the court [was] not presumptively unreliable" and could be used for purposes of sentencing "even though it was uncorroborated"); *United States v. Hugs*, 507 Fed. Appx. 738, 739 (9th Cir. 2013) (finding sufficient indicia of reliability, where the sentencing "court relied upon a sworn affidavit" of a law enforcement officer to make its factual finding).

Second, Det. Benevente's bona fides buttressed the reliability of his sworn statements concerning the casino shooting. For example, Det. Benevente was a 10-year veteran of the Bakersfield P.D. with particular experience investigating violent crimes and firearms offenses, *see* SER-8; he was "familiar with [Ramos] from a previous shooting investigation stemming from an illegal gaming casino," SER-9; he had seen Ramos in person as recently as a few weeks prior to writing his search warrant affidavit and reviewing the surveillance footage, SER-9; and—"[b]ased on [his] training and experience with the operation of firearms"—he recognized that the objects Ramos was holding during the casino shooting were firearms, and that Ramos could be seen in the surveillance footage attempting "to clear [a] malfunction" with one of his firearms, SER-9–10. Given this experience, the court had ample reason to rely upon Det. Benevente's affidavit and thus did not abuse its discretion at sentencing. *See United States v. Ali*, 620 F.3d 1062, 1073 (9th Cir. 2010) (finding that the district court properly relied on hearsay information at sentencing, where the information had been reviewed by IRS agents and others with expertise).

30

Third, the court reasonably relied upon Det. Benevente's observations because they were corroborated by other evidence in the record. For example, the court did not simply accept at face value the detective's statement that Ramos had "distinctive" physical features that helped him identify Ramos in the surveillance footage. *See* SER-9 (search warrant affidavit, noting that Ramos had a "very distinct" nose). Instead, the court conducted its own analysis of the footage and agreed that "[t]he nose and the brow line" of the person seen outside the illegal casino "are distinctive," that—based on the person's clothing and shoes—the person with distinctive features was the same person carrying firearms inside the casino later in the surveillance footage, and that Det. Benevente was able to recognize Ramos as the person carrying firearms in light of his previous contacts with Ramos. ER-15–16, 20. "[W]hen viewed in light of the corroborating evidence," Det. Benevente's affidavit "was sufficiently reliable" to support the district court's findings of fact, and Ramos's sentence should be affirmed. *United States v. Petty*, 982 F.2d 1365, 1369 (9th Cir. 1993); *see United States v. Blitz*, 748 Fed. Appx. 176, 177 (9th Cir. 2019) (holding that "the district court did not err by

31

relying on the police officer's identification because other evidence corroborated it").

Aside from this reliability issue, Ramos suggests that the court erred by making its factual findings concerning the casino shooting without first holding an evidentiary hearing. *See* AOB at 12. But the record undermines this claim. Ramos made clear at his sentencing hearing that he was not "seeking testimony in this case" and, instead, wanted his sentencing challenge to be decided "on the papers." ER-12. Given that concession, this Court will review the district court's decision not to hold an evidentiary hearing only "for plain error." *United States v. Berry*, 258 F.3d 971, 976 (9th Cir. 2001). A plain error that warrants relief on appeal is one "that is plain," "that affects substantial rights," and that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cabaccang*, 481 F.3d 1176, 1184 (9th Cir. 2007).

No such error occurred here. As this Court has long held, neither the Federal Rules of Criminal Procedure nor "due process . . . require[s] an evidentiary hearing to establish the veracity of all information in a presentence report before it may be considered by

the sentencing judge." *Farrow v. United States*, 580 F.2d 1339, 1360 (9th Cir. 1978); *see also Berry*, 258 F.3d at 976. Instead, the defendant need only be given an opportunity "to rebut the recommendations and allegations of the presentence report either orally or through the submission of written affidavits or briefs." *United States v. Stein*, 127 F.3d 777, 780–81 (9th Cir. 1997).

That is exactly the opportunity that Ramos had in this case. He raised his objections both in his paper filings and in oral argument at sentencing. More, he was given the chance to request additional testimony prior to sentencing, and he unequivocally rejected that opportunity. *See* ER-12. Under these circumstances, the court did not plainly err in declining to order an evidentiary hearing sua sponte, and Ramos's within-Guidelines sentence should be affirmed. *See, e.g.*, *United States v. Plascencia-Orozco*, 8523 F.3d 910, 923 (9th Cir. 2017); *Berry*, 258 F.3d at 976.

### D. The district court did not clearly err when it found that Ramos's repeated possession of firearms in 2021 constituted "relevant conduct" under the Sentencing Guidelines.

Ramos's final argument also fails because the district court's determination that the relevant conduct in this case included

Ramos's possession of additional firearms even before his arrest was not clear error. *See* ER-21. As applied to this case, "relevant conduct" includes "all acts and omissions committed . . . or willfully caused by the defendant" "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(1), (2); *see also Parlor*, 2 F.4th at 811–12 (adopting this "framework" in a 922(g)(1)(a) case).

The "common scheme" and "course of conduct" requirements "are closely related concepts." *Parlor*, 2 F.4th at 812 (internal quotation marks omitted). "Offenses are part of a 'common scheme or plan' if they are 'substantially connected to each other by at least one common factor, such as . . . common purpose[] or similar *modus operandi*.'" *Id.* (quoting U.S.S.G. § 1B1.3 cmt. n.5(B)(i)). And "[o]ffenses are 'part of the same course of conduct' if 'sufficiently connected or related to each other' such that they are 'part of a single episode, spree, or ongoing series of offenses.'" *Id.* (quoting U.S.S.G. § 1B1.3 cmt. n.5(B)(ii)). "Factors that are appropriate to" consider in this "relatedness" analysis "include the degree of similarity of the

offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." U.S.S.G. § 1B1.3 cmt. n.5(B)(ii)).

Here, the district court did not clearly err when it examined these factors and found that Ramos's repeated instances of illegal firearm possession in May, June, and July 2021 amounted to "relevant conduct." *See* ER-12; *see United States v. MacDonald*, 992 F.2d 967, 970 (9th Cir. 1993) ("Whether conduct" should be considered relevant conduct "is a factual determination which can be overturned only if clearly erroneous.").

After all, as the court correctly found, Ramos "engaged in substantially identical offenses." ER-21. In each instance, Ramos—a convicted felon—was in possession of firearms he knew he could not possess. Moreover, Ramos engaged in this behavior "during a relevant time period that was close in time to" his offense of conviction. ER-21. Only nine weeks separated the casino shooting from Ramos's arrest, and his inculpatory WhatsApp and Viber communications happened just days before that arrest. Given these facts, the court did not clearly err when it found that Ramos's "other

uncharged firearms" amounted to relevant conduct under the Guidelines. *Parlor*, 2 F.4th at 812.

Ramos objects to that conclusion on several grounds, none of which has merit. He first claims that his possession of firearms at the casino shooting could not qualify as "relevant conduct" because he did not possess those firearms "'during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.'"[8] AOB at 20–21 (quoting U.S.S.G. § 1B1.3(a)(1)(B)).

But that argument misreads the Guidelines provision that governs Ramos's case: Section 1B1.3(a)(2). As described above, that

---

[8] Again, Ramos ignores the court's factual findings concerning his possession of other firearms beyond those from the casino shooting. As a result, he does not appear to challenge on appeal the court's conclusion that, for example, Ramos used Viber on July 5 to "report[] having purchased or having in his possession a ghost gun." ER-20. Nor does he appear to challenge the court's conclusion that— "based upon th[e] evidence" described at sentencing, including Ramos's WhatsApp and Viber communications—Ramos "was engaged in substantially identical offenses during a relevant time period that was close in time to the incident offense such that it does constitute relevant conduct." ER-21. This Court should therefore consider any such argument waived and affirm Ramos's sentence. *See Kama*, 394 F.3d at 1238; *Trujillo*, 402 Fed. Appx. at 324.

provision controls because Ramos's firearm offenses are "of a character" that "would require grouping of multiple counts." *Parlor*, 2 F.4th at 812 (internal quotation marks). And crucially, that provision expands the scope of "relevant conduct" to encompass not just "acts or omissions . . . that occurred during" or "in preparation for" or "in the course of avoid[ing] detection or responsibility for" the offense of conviction, but also "acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. §§ 1B1.3(a)(1), (2). Because Ramos's threshold argument misinterprets Section 1B1.3(a)(2), the court's 92-month sentence should be affirmed.[9]

---

[9] Ramos cites two Tenth Circuit cases for the proposition that the Guidelines' "relevant conduct" definition requires that the alleged relevant conduct occur "during" or "in preparation for" or "in the course of avoid[ing] detection or responsibility for" the offense of conviction. *See* AOB at 20. But those cases do not stand for that proposition. Indeed, in *United States v. Taylor*, 97 F.3d 1360, 1363 (10th Cir. 1996), the Tenth Circuit concluded that drugs found as part of a search separate and apart from the drugs for which the defendant was convicted qualified as "relevant conduct" under Section 1B1.3(a)(2) despite the fact that those separate drugs could not be attributed to any "acts or omissions" that "occur[red] during, in preparation for, or in an attempt to avoid detection or responsibility for the offense of conviction." Even under Tenth

Ramos's second argument—that "[t]he alleged relevant conduct does not group with the instant offense"—also fails. AOB at 21 (emphasis omitted). Section 3D1.2 requires that "[a]ll counts involving substantially the same harm shall be grouped together into a single [g]roup." Notably, Section 3D1.2 further provides that "[o]ffenses covered by [§ 2K2.1 (*i.e.*, offenses involving firearms)] are to be grouped under this subsection." The upshot is that "[f]irearm offenses"—like Ramos's repeated illegal possession of firearms in May, June, and July 2021—"may be grouped under the 'relevant conduct' principles in § 1B1.3(a)(2)." *Parlor*, 2 F.4th at 812. Because Ramos's contrary position cannot be squared with Section 3D1.2 (or this Court's binding precedent interpreting and applying it), his claim should be rejected, and his sentence should be affirmed.

Ramos nevertheless persists that the court's "relevant conduct" factual determinations must be clear error because there was insufficient proof that his possession of firearms before his arrest involved "real guns." AOB at 21–22. That is wrong. Far from

Circuit precedent, then, Ramos's argument fails, and his sentence should be affirmed.

clearly erroneous (*i.e.*, "illogical, implausible, or without support in the record," *Spangle*, 626 F.3d at 497), the court's findings were built on substantial record evidence, including: the Viber messages in which Ramos admits "possession [of] a ghost gun," ER-20; the surveillance footage showing Ramos holding two firearms, ER-16, 51–52; Det. Benevente's sworn testimony summarizing how he recognized Ramos's attempts to discharge his firearm and clear a malfunction, *see* SER-9–10; and the circumstances surrounding the casino shooting (*e.g.*, the ShotSpotter activations, and the fact that one of Ramos's accomplices suffered "two gunshot wounds"), PSR ¶¶ 5–6; SER-8. Because the court's fact-finding does not exhibit any clear error, this Court should affirm. *See United States v. Daychild*, 357 F.3d 1082, 1103–04 (9th Cir. 2004).

*United States v. Hahn*, 960 F.2d 903 (9th Cir. 1992), does not change this conclusion. Ramos relies on that case to argue that the court clearly erred when it found that his earlier possession of firearms was "part of the same 'course of conduct' or 'common scheme or plan' as [his] offense of conviction." AOB at 22–25. But *Hahn* does not support that conclusion. There, this Court remanded for

additional fact-finding, where there was a "gap of more than five months between" the defendant's allegedly "relevant conduct" and the conduct underlying his offense of conviction. 960 F.2d at 910, 911. Here, by contrast, the "time span" separating Ramos's "substantially identical" firearms offenses—a few days or weeks—"is well within the range that courts have accepted in concluding that the unlawful possession of additional firearms is conduct relevant to the unlawful possession of firearms for which [Ramos was] charged." *Parlor*, 2 F.4th at 812, 813. On these facts, neither *Hahn* nor any other case cited by Ramos requires a remand for additional findings, and thus Ramos's sentence should be affirmed.

## CONCLUSION

The government respectfully requests that this Court affirm Ramos's 92-month sentence.

Respectfully submitted,

PHILLIP A. TALBERT
United States Attorney

/s/ Aaron D. Pennekamp
AARON D. PENNEKAMP
Assistant United States Attorney

40

## STATEMENT OF RELATED CASES

The government is not aware of any related cases.

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 7,630 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

DATED: August 11, 2023                    /s/ Aaron D. Pennekamp
                                          AARON D. PENNEKAMP
                                          Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on August 11, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Aaron D. Pennekamp
AARON D. PENNEKAMP
Assistant United States Attorney